OPINION OF THE COURT
Chief Judge Cooke.
These appeals involve a question of criminal responsibility in which defendants, charged with homicide, contend that their conduct did not cause death.
*346 The term “death”, as used in this State’s statutes, may be construed to embrace a determination, made according to accepted medical standards, that a person has suffered an irreversible cessation of breathing and heartbeat or, when these functions are artificially maintained, an irreversible cessation of the functioning of the entire brain, including the brain stem. Therefore, a defendant will not necessarily be relieved of criminal liability for homicide by the removal of the victim’s vital organs after the victim has been declared dead according to brain-based criteria, notwithstanding that, at that time, the victim’s heartbeat and breathing were being continued by artificial means.
I

People v Eulo

On the evening of July 19, 1981, defendant and his girlfriend attended a volunteer firemen’s fair in Kings Park, Suffolk County. Not long after they arrived, the two began to argue, reportedly because defendant was jealous over one of her former suitors, whom they had seen at the fair. The argument continued through the evening; it became particularly heated as the two sat in defendant’s pick-up truck, parked in front of the home of the girlfriend’s parents. Around midnight, defendant shot her in the head with his unregistered handgun.
The victim was rushed by ambulance to the emergency room of St. John’s Hospital. A gunshot wound to the left temple causing extreme hemorrhaging was apparent. A tube was placed in her windpipe to enable artificial respiration and intravenous medication was applied to stabilize her blood pressure.
Shortly before 2:00 a.m., the victim was examined by a neurosurgeon, who undertook various tests to evaluate damage done to the brain. Painful stimuli were applied and yielded no reaction. Various reflexes were tested and, again, there was no response. A further test determined that the victim was incapable of spontaneously maintaining respiration. An electroencephalogram (EEC) resulted in “flat,” or “isoelectric”, readings indicating no activity in the part of the brain tested.
Over the next two days, the victim’s breathing was maintained solely by a mechanical respirator. Her heartbeat was sustained and regulated through medication. *347 Faced with what was believed to be an imminent cessation of these two bodily functions notwithstanding the artificial maintenance, the victim’s parents consented to the use of certain of her organs for transplantation.
On the afternoon of July 23, a second neurosurgeon was called in to evaluate whether the victim’s brain continued to function in any manner. A repetition of all of the previously conducted tests led to the same diagnosis: the victim’s entire brain had irreversibly ceased to function. This diagnosis was reviewed and confirmed by the Deputy Medical Examiner for Suffolk County and another physician.
The victim was pronounced dead at 2:20 p.m. on July 23, although at that time she was still attached to a respirator and her heart was still beating. Her body was taken to a surgical room where her kidneys, spleen, and lymph nodes were removed. The mechanical respirator was then disconnected, and her breathing immediately stopped, followed shortly by a cessation of the heartbeat.
Defendant was indicted for second degree murder. After a jury trial, he was convicted of manslaughter. The Appellate Division unanimously affirmed the conviction, without opinion.

People v Bonilla

At approximately 10:30 p.m. on February 6,1979, a New York City police officer found a man lying faceup in a Brooklyn street with a bullet wound to the head. The officer transported the victim in his patrol car to the Brookdale Hospital, where he was placed in an intensive care unit. Shortly after arriving at the hospital, the victim became comatose and was unable to breathe spontaneously. He was placed on a respirator and medication was administered to maintain his blood pressure.
The next morning, the victim was examined by a neurologist. Due to the nature of the wound, routine tests were applied to determine the level, if any, of the victim’s brain functions. The doctor found no reflex reactions and no response to painful stimuli. The mechanical respirator was disconnected to test for spontaneous breathing. There was *348 none, and the respirator was reapplied. An EEG indicated an absence of activity in the part of the brain tested. In the physician’s opinion, the bullet wound had caused the victim’s entire brain to cease functioning.
The following day, the tests were repeated and the same diagnosis was reached. The victim’s mother had been informed of her son’s condition and had consented to a transfer of his kidneys and spleen. Death was pronounced following the second battery of tests and, commencing at 9:25 p.m., the victim’s kidneys and spleen were removed for transplantation. The respirator was then disconnected, and the victim’s breathing and heartbeat stopped.
An investigation led to defendant’s arrest. While in police custody, defendant admitted to the shooting. He was indicted for second degree murder and criminal possession of a weapon. A jury convicted him of the weapons count and of first degree manslaughter. The conviction was affirmed by a divided Appellate Division.
II
Defendants’ principal point in each of these appeals is that the respective Trial Judges failed to adequately instruct the juries as to what constitutes a person’s death, the time at which criminal liability for a homicide would attach. It is claimed that in New York, the time of death has always been set by reference to the functioning of the heart and the lungs; that death does not occur until there has been an irreversible cessation of breathing and heartbeat.
There having been extensive testimony at both trials concerning each victim’s diagnosis as “brain dead,” defendants argue that, in the absence of clear instruction, the juries may have erroneously concluded that defendants would be guilty of homicide if their conduct was the legal cause of the victims’ “brain death” rather than the victims’ ultimate state of cardiorespiratory failure. In evaluating defendants’ contentions, it is first necessary to review: how death has traditionally been determined by the law; how the principle of “brain death” is now sought to be infused into our jurisprudence; and, whether, if at all, this court may recognize a principle of “brain death” without infringing upon a legislative power or prerogative.
*349 (a)
A person’s passing from life has long been an event marked with a variety of legal consequences. A determination of death starts in motion the legal machinery governing the disposition of the deceased’s property (see, generally, EPTL arts 3,4, 5 and 6). It serves to terminate certain legal relationships, including marriage (see NY Jur, Domestic Relations, § 1), and business partnerships (see Partnership Law, § 62, subd 4). The period for initiation of legal actions brought against, by, or on behalf of the deceased is extended (see CPLR 210). And, in recent times, death marks the point at which certain of the deceased’s organs, intended to be donated upon death, may be transferred (see Public Health Law, § 4301, subd 1). In the immediate context, pertinent here, determination of a person’s “death” is relevant because our Penal Law defines homicide in terms of “conduct which causes the death of a person” (Penal Law, § 125.00 [emphasis added]).
Death has been conceptualized by the law as, simply, the absence of life: “Death is the opposite of life; it is the termination of life” (Evans v People, 49 NY 86, 90). But, while erecting death as a critical milepost in a person’s legal life, the law has had little occasion to consider the precise point at which a person ceases to live.[1]
When the question arises as to when death occurs, it has been deemed one of fact (see Matter of Di Bella, 279 App Div 689), in which the fact finder may be called upon to evaluate expert medical testimony (see id.; Matter of Bucci, 57 Misc 2d 1001; Matter of Rose, 201 Misc 470). This has usually been in the context of an attempt by parties to prove the relative survivorship of two or more people killed in a common disaster, when the order of death affected the *350 distribution of the decedents’ estates.[2] And, while many of the efforts by parties attempting to prove survivorship are based on circumstantial evidence as to the relative times of death (see Matter of Di Bella, supra [evidence that wife suffered from asthma and would suffocate in shorter time]; Matter ofBucci, supra [presence of carbon monoxide in the lungs of only one of the decedents]; Matter of Hayward, 143 Misc 401 [greater presence of carbon monoxide in lungs and comparatively greater physical warmth of one corpse]; see, also, People v Lipsky, 57 NY2d 560), it is clear that the criteria used for determining death have been the medical standards (see Matter of Bausch, 100 Misc 2d 817, 818) of irreversible cessation of cardiac and respiratory functions (cf. Matter of Rose, 201 Misc 470, 472, supra; see, also, People v Dlugash, 41 NY2d 725, 730-731; Smith v Smith, 229 Ark 579, 586-587; Thomas v Anderson, 96 Cal App 2d 371, 375).
(b)
Within the past two decades, machines that artificially maintain cardiorespiratory functions have come into widespread use. This technical accomplishment has called into question the universal applicability of the traditional legal and medical criteria for determining when a person has died.[3]
These criteria were cast into flux as the medical community gained a better understanding of human physiology.[4] *351 It is widely understood that the human brain may be anatomically divided, generally, into three parts: the cerebrum, the cerebellum, and the brain stem. The cerebrum, known also as the “higher brain,” is deemed largely to control cognitive functions such as thought, memory, and consciousness. The cerebellum primarily controls motor coordination.[5] The brain stem, or “lower brain,” which itself has three parts known as the midbrain, pons, and medulla, controls reflexive or spontaneous functions such as breathing, swallowing, and “sleep-wake” cycles.[6]
In addition to injuries that directly and immediately destroy brain tissue, certain physical traumas may indirectly result in a complete and irreversible cessation of the brain’s functions. For example, a direct trauma to the head can cause great swelling of the brain tissue, which, in turn, will stem the flow of blood to the brain. A respiratory arrest will similarly cut off the supply of oxygen to the blood and, hence, the brain.[7] Within a relatively short period after being deprived of oxygen, the brain will irreversibly stop functioning.[8] With the suffocation of the higher brain all cognitive powers are lost and a cessation of lower brain functions will ultimately end all spontaneous bodily functions.[9]
Notwithstanding a total irreversible loss of the entire brain’s functioning, contemporary medical techniques can maintain, for a limited period, the operation of the heart and the lungs.[10] Respirators or ventilators can substitute for the lower brain’s failure to maintain breathing.[11] This artificial respiration, when combined with a chemical regimen, can support the continued operation of the heart.[12] This is so because, unlike respiration, the physical con *352 tracting or “beating” of the heart occurs independently of impulses from the brain: so long as blood containing oxygen circulates to the heart, it may continue to beat and medication can take over the lower brain’s limited role in regulating the rate and force of the heartbeat.[13]
It became clear in medical practice that the traditional “vital signs” — breathing and heartbeat — are not independent indicia of life, but are, instead, part of an integration of functions in which the brain is dominant.[14] As a result, the medical community began to consider the cessation of brain activity as a measure of death.[15]
The movement in law towards recognizing cessation of brain functions as criteria for death followed this medical trend. The immediate motive for adopting this position was to ease and make more efficient the transfer of donated organs.[16] Organ transfers, to be successful, require a “viable, intact organ.”[17] Once all of a person’s vital functions have ceased, transferable organs swiftly deteriorate and lose their transplant value.[18] The technical ability to artificially maintain respiration and heartbeat after the entire brain has ceased to function was sought to be applied in cases of organ transplant to preserve the viability of donated organs.[19]
Thus, the first legal recognition of cessation of brain functions as a criterion for determining death came in the *353 form of a Kansas statute enacted in 1970.[20] Denominated “[a]n Act relating to and defining death,” the statute states, in part, that death will be deemed to have occurred when a physician applying ordinary medical standards determines that there is an “absence of spontaneous respiratory and cardiac functions and * * * attempts at resuscitation are considered hopeless * * * or * * * there is the absence of spontaneous brain function.”[21]
In the years following enactment of this statute, a growing number of sister States enacted statutes of their own.[22] Some opted for the Kansas approach.[23] Others defined death solely in terms of brain-based criteria as determined by accepted methods of medical practice.[24] And still others retain the cardiorespiratory yardstick, but provide that when artificial means of sustaining respiration and heartbeat preclude application of the traditional criteria, death may be determined according to brain-based criteria, namely the irreversible cessation of brain functions.[25] In the absence of any statute defining death, some jurisdictions have judicially adopted brain-based criteria for determining death.[26] Professional and quasi-governmental *354 groups (including the American Bar Association, the American Medical Association, the President’s Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, and the National Conference of Commissioners on Uniform State Laws) have jointly indorsed a single standard that includes both cardiorespiratory and brain-based criteria.[27]
(c)
In New York, the term “death”, although used in many statutes, has not been expressly defined by the Legislature. This raises the question of how this court may construe these expressions of the term “death” in the absence of clarification by the Legislature. When the Legislature has failed to assign definition to a statutory term, the courts will generally construe that term according to “its ordinary and accepted meaning as it was understood at the time” (People ex rel. Lichtenstein v Langan, 196 NY 260, 264). If the term at issue has been judicially defined prior to its use in a statute, however, that definition will be assigned to the term, absent contrary indications (People v Richards, 108 NY 137; see People v Most, 128 NY 108, 113; cf. Orinoco Realty Co. v Bandler, 233 NY 24). In every case, of course, the term must be read in accordance with the apparent purpose of the statute in which it is found (see People v Ryan, 274 NY 149; People v Kaye, 212 NY 407).
Bearing these principles in mind, it must be added that statutory construction is not “a ritual to be observed by unimaginative adherence to well-worn professional phrases” (Frankfurter, Some Reflections on the Reading of Statutes, 47 Col L Rev 527, 529). For, as this court has observed, “[f]ew words are so plain that the context or the occasion is without capacity to enlarge or narrow their extension” (Surace v Danna, 248 NY 18, 21). This is particularly true when a “word * * * must be applied under changed conditions” (Dixon v Robbins, 246 NY 169, 173; see, also, People v Hines, 284 NY 93,101-103). The guiding *355 principle is that there must always be fidelity to the fair import of the term (see Dixon v Robbins, supra).
It has been called to this court’s attention that the Legislature has, on a number of occasions, had bills before it that would expressly recognize brain-based criteria for determining death and has taken no affirmative action (see People v Bonilla, 95 AD2d 396,402, n 5 [opn per Rubin, J.]). This legislative void in no way impedes this court from fulfilling its obligation to construe laws of the State. Indeed, advances made in medical science have caused a focus on the issues of when a jury may find criminal responsibility for homicide, of when physicians may transfer donated organs, and of when a person’s body may be accorded the dignity of final repose. It is incumbent upon this court to instill certainty and uniformity in these important areas.
We hold that a recognition of brain-based criteria for determining death is not unfaithful to prior judicial definitions of “death”, as presumptively adopted in the many statutes using that term. Close examination of the common-law conception of death and the traditional criteria used to determine when death has occurred leads inexorably to this conclusion.
Courts have not engaged in a metaphysical analysis of when life should be deemed to have passed from a person’s body, leaving him or her dead. Rather, they have conceptualized death as the absence of life, unqualified and undefined (see Evans v People, 49 NY 86, 90, supra). On a practical level, this broad conception of death as “the opposite of life” was substantially narrowed through recognition of the cardiorespiratory criteria for determining when death occurs. Under these criteria, the loci of life are the heart and the lungs: where there is no breath or heartbeat, there is no life. Cessation manifests death.
Considering death to have occurred when there is an irreversible and complete cessation of the functioning of the entire brain, including the brain stem, is consistent with the common-law conception of death (see Commonwealth v Golston, 373 Mass 249, 254). Ordinarily, death will be determined according to the traditional criteria of irreversible cardiorespiratory repose. When, however, the *356 respiratory and circulatory functions are maintained by mechanical means, their significance, as signs of life, is at best ambiguous. Under such circumstances, death may nevertheless be deemed to occur when, according to accepted medical practice, it is determined that the entire brain’s function has irreversibly ceased.
Death remains the single phenomenon identified at common law; the supplemental criteria are merely adapted to account for the “changed conditions” that a dead body may be attached to a machine so as to exhibit demonstrably false indicia of life. It reflects an improved understanding that in the complete and irreversible absence of a functioning brain, the traditional loci of life — the heart and the lungs — function only as a result of stimuli originating from outside of the body and will never again function as part of an integrated organism.[28]
This court searches in vain for evidence that, apart from the concept of death, the Legislature intended to render immutable the criteria used to determine death. By extension, to hold to the contrary would be to say that the law could not recognize diagnostic equipment such as the stethoscope or more sensitive equipment even when it became clear that these instruments more accurately measured the presence of signs of life.
Moreover, the Legislature has consistently declared, from the time it adopted the Field Commission’s draft of a Penal Code in 1881 through several recodifications, that our Penal Law should be construed “according to the fair *357 import of [its] terms to promote justice and effect the objects of the law” (Penal Law, § 5.00). It is the first object of our Penal Law “[t]o proscribe conduct which unjustifiably and inexcusably causes or threatens substantial harm to individual or public interests” (Penal Law, § 1.05, subd 1). Therefore, in the instant matters, to construe our homicide statute to provide for criminal responsibility for homicide when a defendant’s conduct causes injury leading to the victim’s total loss of brain functions, is entirely consistent with the Legislature’s concept of death.
(d)
One must be careful to distinguish the effect of this decision — determining when a person has died — from issues raised in related but qualitatively distinct cases — determining when a person may be allowed to die. In Matter of Storar (52 NY2d 363), this court reviewed two separate applications brought on behalf of two terminally ill patients. One sought permission to terminate extraordinary medical care. The other sought permission, over the patient’s mother’s objection, to administer medically necessary blood transfusions that would have prolonged the patient’s short-lived life. A personal right to decline medical care, founded at common law, was applied in the first case as there existed clear and convincing evidence that this was the patient’s personal desire. But, in the second case, the court held that, in the absence of such evidence of personal intent (there, due to the patient’s incompetence), a third party has no recognized right to decide that the patient’s quality of life has declined to a point where treatment should be withheld and the patient should be allowed to die (compare Matter of Storar, 52 NY2d, at pp 370, n 2, 382, with id., at pp 389-391 [Jones, J., dissenting in part]).
Today’s decision is no retreat from that holding. Under existing law, third parties are without authority to determine on behalf of the terminally ill that they should be permitted to die. This court will make no judgment as to what is for another an unacceptable quality of life. But, when a determination has been made according to accepted medical standards[29] that a person has suffered an irreversi *358 ble cessation of heartbeat and respiration, or, when these functions are maintained solely by extraordinary mechanical means, an irreversible cessation of all functions of the entire brain, including the brain stem, no life traditionally recognized by the law is present in that body.[30]
Ill
Each defendant correctly notes that the respective Trial Judges did not expressly instruct the juries concerning the criteria to be applied in determining when death occurred. Whether medically accepted brain-based criteria are legally cognizable became ah issue in these cases when the respective juries heard testimony concerning the victims being pronounced medically dead while their hearts were beating and before artificial maintenance of the cardiorespiratory systems was discontinued. To properly evaluate whether these diagnoses of death were legally and medically premature and, therefore, whether the subsequent activities were possibly superseding causes of the deaths, the juries had to have been instructed as to the appropriate criteria for determining death: irreversible cessation of breathing and heartbeat or irreversible cessation of the entire brain’s functioning.
The courts here adequately conveyed to the juries their obligation to determine the fact and causation of death. The courts defined the criteria of death in relation to the chain of causation. By specifically charging the juries that they might consider the surgical procedures as superseding *359 causes of death, the courts made clear by ready implication that death should be deemed to have occurred after all medical procedures had ended.
The trial courts could have given express instructions that death may be deemed to have occurred when the victims’ entire brain, including the brain stem, had irreversibly ceased to function. On the facts of these cases, that would have been the better practice. But, as mentioned, the brain-based criteria are supplemental to the traditional criteria, each describing the same phenomenon of death. In the context of a criminal case for homicide, there is no theoretical or practical impediment to the People’s proceeding under a theory that the defendant “cause[d] the death” of a person, with death determined by either criteria.
Even though each of these cases was presented to a jury which had been charged that death should be deemed to have occurred after the medical intervention had ended, testimony concerning the attending physicians’ diagnoses of the victims as dead, according to brain-based criteria, was nonetheless highly relevant. It was these medical pronouncements that caused the victims to be removed from the medical systems that maintained their breathing and heartbeat. If the victims were properly diagnosed as dead, of course, no subsequent medical procedure such as the organ removals would be deemed a cause of death. If victims’ deaths were prematurely pronounced due to a doctor’s negligence, the subsequent procedures may have been a cause of death, but that negligence would not constitute a superseding cause of death relieving defendants of liability (see People v Stewart, 40 NY2d 692, 697-698; People v Kane, 213 NY 260, 270). If, however, the pronouncements of death were premature due to the gross negligence or the intentional wrongdoing of doctors, as determined by a grave deviation from accepted medical practices or disregard for legally cognizable criteria for determining death, the intervening medical procedure would interrupt the chain of causation and become the legal cause of death (see People v Kane, supra, at pp 270-271; see, also, State v Scates, 50 NC 420). Thus, the propriety of the medical procedures is integral to the question of causation.
*360 A review of the records, viewed in a light most favorable to the People, indicates that there was sufficient evidence for a rational juror to have concluded beyond a reasonable doubt that each defendant’s conduct caused the victim’s death and that the medical procedures were not superseding causes of death (see People v Contes, 60 NY2d 620, 621). There was ample testimony at both trials to the effect that determining death by brain-based criteria had long been an accepted medical practice. Nor were the physicians acting without some legal authority in grounding their determinations on brain-based criteria. In 1975, a lower court construed the term “death,” as used in New York’s enactment of the Uniform Anatomical Gift Act (see Public Health Law, art 43), as embracing brain-based criteria (see Matter of New York City Health & Hosps. Corp. v Sulsona, 81 Misc 2d 1002). When the instant cases arose several years later, there existed no contrary statement of the law by either the Legislature or any appellate court.
An expert medical witness for defendant Bonilla cast some aspersions on the particular diagnostic tests performed by the doctors in that case. In the face of that testimony, however, there was substantial testimony by other experts indicating that the diagnostic tests comported with accepted medical practice. Defendant Eulo offered no rebuttal to the testimony that the pronouncement of death was made in accordance with accepted medical practices. Thus, there was sufficient evidence for both juries to have found beyond a reasonable doubt that the medical decisions did not break the causal chain linking defendants’ conduct and the victims’ deaths.
IV
Defendant Eulo’s other arguments have been considered and found to be either unpreserved or without merit.
Accordingly, in each case, the order of the Appellate Division should be affirmed.
Judges Jasen, Jones, Wachtler, Meyer, Simons and Kaye concur.
In each case: Order affirmed.

. Ordinarily, the precise time of death has no legal significance. Even when relevant, legal fictions or presumptions as to the time of death are often employed, such as when a person has been continuously absent for a period of more than five years (see EPTL 2-1.7, subd [a]; Matter of Katz, 135 Misc 861). Although the statute providing for an action for wrongful death provides a limitation of two years from the time of “death” (see EPTL 5-4.1), we find no cases in which the time of an action’s accrual was at issue. In the same vein are criminal cases applying the common-law rule that conduct, to constitute murder, must cause death within one year and one day (see Burns & Cary v People, 1 Parker Cr Rep 182,185). This rule has long been abrogated in New York (see People v Brengard, 265 NY 100, 105-108; People v Legeri, 239 App Div 47), thereby removing one possible need to measure when death has occurred.

. In many circumstances, the order in which two people die, for example a husband and wife, may profoundly affect how their respective estates are distributed. At common law, when two or more people were killed in a common disaster, there was no “presumption either of survivorship or simultaneous death” (McGowin v Menken, 223 NY 509, 511; see Newell v Nichols, 75 NY 78, 89). This rule has been altered by statute to provide for equity in the devolution or disposition of property when “there is no sufficient evidence that persons have died otherwise than simultaneously” (EPTL 2-1.6).

. See, generally, Report of President’s Comm for Study of Ethical Problems in Medicine and Biomedical and Behavioral Research on Defining Death: Medical, Legal and Ethical Issues in Determination of Death (1981) (hereinafter Comm Report), US Supt Docs, No Pr 40.8; ET 3/D34, pp 13-42; Walton, On Defining Death, pp 1-17; Abram, Need for Uniform Law on the Determination of Death, 27 NYLS L Rev 1187,1187-1193; Compton, Telling The Time of Human Death by Statute: An Essential and Progressive Trend, 31 Wash & Lee L Rev 521, 521-532; Capron & Kass, A Statutory Definition of the Standards for Determining Human Death: An Appraisal and a Proposal, 121 U of Pa L Rev 87, 87-92.

. See Comm Report, supra, n 3, at pp 13-18; Walton, supra, n 3, at pp 29-32; Abram, supra, n 3, at pp 1190-1191; see, also, Schwager, Life, Death and the Irreversibly Comatose, printed in Ethical Issues in Death and Dying (Beauchamp & Perlin [eds]), at pp 38-45.

. 1 Goldenson, Encyclopedia of Human Behavior, at p 192.

. See Comm Report, supra, n 3, at p 15.

. See Comm Report, supra, n 3, at p 16; Report of Ad Hoc Committee of Harvard Medical School to Examine the Definition of Brain Death, A Definition of Irreversible Coma, 205 JAMA 337, 338 (hereinafter Harvard Report).

. See Comm Report, supra, n 3, at pp 16-17; Capron & Kass, supra, n 3, at pp 89-91; Harvard Report, supra, n 7, at pp 338-339.

. See Comm Report, supra, n 3, at pp 16-18.

. See Comm Report, supra, n 3, at pp 21-24; Black, Definitions of Brain Death, printed in Ethical Issues in Death and Dying (Beauchamp & Perlin [eds]), at pp 5-6; Capron & Kass, supra, n 3, at pp 89-91; Harvard Report, supra, n 7, at pp 338-339.

. See authorities cited, supra, n 10.

. See authorities cited, supra, n 10.

. See Comm Report, supra, n 3, at pp 16-17; Black, supra, n 10, at pp 5-6.

. See Comm Report, supra, n 3, at p 15; Capron & Kass, supra, n 3, at p 89; Harvard Report, supra, n 7, at pp 338-340.

. See Comm Report, supra, n 3, at pp 21-29; but see Biorck, When is Death?, 1968 Wis L Rev 484. The initial problem for doctors was to devise a technical means of verifying when the entire brain ceases to function. Unlike tests for determining the cessation of breathing and heartbeat, more sophisticated means were necessary to measure the less obvious functioning of the brain. A seminal study was issued in 1968, under the auspices of Harvard Medical School (see Harvard Report, supra, n 7), setting forth a multistep test designed to identify the existence of physical indicia of brain activity. Under it, responsiveness to painful stimuli is to be tested. The subject is also to be observed for any spontaneous movement or respiration and any operation of various bodily reflexes. The absence of brain activity, when demonstrated under these tests, is then sought to be confirmed by reapplication of the tests at least 24 hours later and through the reading of an BEG, which when “flat” has confirmatory value. This test has served as the foundation for currently applied tests for determining when the brain has ceased to function.

. Capron & Kass, supra, n 3, at pp 108-109; Jonas, Against the Stream: Comments on the Definition and Redefinition of Death, reprinted in Ethical Issues in Death and Dying, at p 51.

. Comm Report, supra, n 3, at p 23.

. Id.

. See authorities cited, supra, n 15.

. See L 1970, ch 348, Kan Laws 994, codified at Kan Stats Ann, § 77-202.

. Following the second part of the disjunctive definition, as originally enacted, is the statement: “Death is to be pronounced before artificial means of supporting respiratory and circulatory function are terminated and before any vital organ is removed for purposes of transplantation.” This final sentence, which intimates that the brain-based criteria are to be utilized only in transplant cases, precipitated some criticism of the statute. Two commentators noted that “[t]he primary fault with this legislation is that it appears to be based on, or at least gives voice to, the misconception that there are two separate phenomena of death. This dichotomy is particularly unfortunate because it seems to have been inspired by a desire to establish a special definition for organ transplantation” (Capron & Kass, supra, n 3, at p 109). They added that the two-part definition set forth in the Kansas statute leaves “open the prospect ‘that X at a certain stage in the process of dying can be pronounced dead, whereas Y, having arrived at the same point, is not said to be dead’ ” (id., at p 110, quoting Kennedy, Kansas Statute on Death: An Appraisal, 285 New Eng J Med 946, 948). This provision was subsequently deleted from the statute. (See Kan Stats Ann, 8 77-202, L 1979, ch 199, 8 11.)

. See, generally, Comm Report, supra, n 3, at Appendix C. Our amicus informs us that, to date, at least 34 States have statutorily recognized brain-based criteria as a means of determining death. At least nine others have judicially adopted these criteria.

. See, e.g., Md Ann Code, art 43, 8 54F (now Md Ann Code, 8 5-202); NM Stats Ann, 8 12-2-4.

. See, e.g., Ark Stats Ann, 88 82-537 — 82-538; 111 Ann Stats, ch 110½, § 302; Mont Codes Ann, 8 50-22-101.

. See, e.g., Ala Code, §§ 22-31-1; Iowa Code Ann, § 702.8; Tex Rev Civ Stats Ann, art 4447t.

. See, e.g., State v Fierro, 124 Ariz 182, 185-186; Commonwealth v Golston, 373 Mass 249, 253-256; State v Meints, 212 Neb 410, 413-419; State v Johnson, 56 Ohio St 2d 35.

. The recommended standard provides: “An individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards” (see Comm Report, supra, n 3, at p 2).

. In reaching this conclusion, this court is aware of the criticism from some quarters that the perceived motivation for the development and recognition of brain-based criteria for death renders these criteria “theoretically impure.” This is asserted on the ground that the prospect of more easily accessible transplants serves to “adulterate the purity of [the] scientific case by baiting it with the prospect of this extraneous — though extremely appealing — gain” (Jonas, supra, n 16, at p 52 [emphasis in original]). Although, practically speaking, adoption of these supplemental criteria will indeed facilitate organ transplants, it has been found that “the need for viable organs to transplant does not account fully for the interest in diagnosing irreversible loss of brain functions” (Comm Report, supra, n 3, at p 23). The Presidential Commission, charged with evaluating how death should be determined, cited studies reporting “that organs are procured in only a small percentage of cases in which brain-based criteria might be applied” (id.). The Commission itself found that the “medical concern over the determination of death rests much less with any wish to facilitate organ transplantation than with the need both to render appropriate care to patients and to replace artificial support with more fitting and respectful behavior when a patient has become a dead body” (id., at pp 23-24).

. This court has rejected judicial attempts to formulate detailed legal standards *358 governing procedures leading to medical diagnoses (see Matter of Storar, 52 NY2d 363, modfg 73 AD2d 431). Today we decline to set forth what particular medical diagnostic tests should be performed before a person’s brain functions may be found to have irreversibly ceased. Any attempt to establish a specific procedure might inhibit the development and application of more sophisticated diagnostic methods. Therefore, it is sufficient that a particular determination be made according to accepted medical standards.

. When any function of the brain persists, of course, death may not be deemed to have occurred. For example, a person may have suffered an irreversible loss of higher brain functions and, yet, the brain-stem functions subsist. This condition is “usually called a ‘persistent vegitative state’ or ‘persistent noncognitive state.’ Such persons [suffering this condition] may exhibit spontaneous, involuntary movements such as yawns or facial grimaces, their eyes may be open and they may be capable of breathing without assistance. *** The case of Karen Anne Quinlin has made this condition familiar to the general public [see Matter of Quinlan, 137 NJ Super 227, mod 70 NJ 10, cert den sub nom. Garger v New Jersey, 429 US 922]. With necessary medical and nursing care * * * such patients can survive months or years, often without a respirator.” (Comm Report, supra, n 3, at p 18 [nn omitted].)