■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM LAI, Appellant.—Appeal by the defendant from a judgment of the County Court, Suffolk County (Namm, J.), rendered May 19, 1983, convicting him of murder in the second degree, manslaughter in the first degree and attempted robbery in the first degree, upon a jury verdict, and imposing sentence.

Ordered that the judgment is affirmed.

During the course of an attempted robbery of the Nesconset Shell Station on March 20, 1982, the defendant, acting in concert with two others, shot Richard Berger in the head at point blank range. The bullet wound caused a severe direct injury to Berger's brain, and, although his cardiorespiratory systems continued to function with the aid of a respirator and blood pressure medication, the attending doctors, as well as the consulting physicians, diagnosed him, after several thorough physical and neurological examinations, as brain dead. Subsequently, on March 26, 1982, pursuant to the Anatomical Gift Act (Public Health Law § 4300 *et seq.*), Berger underwent surgery and some of his vital organs were removed for transplant purposes. The respirator was then turned off, and his cardiorespiratory systems ceased functioning.

At the trial, the defendant did not dispute that he shot Berger, but rather proceeded on the theory that the shooting did not cause the victim's death. Specifically, the defendant maintained that the doctors caused the victim's death by performing transplant surgery while his cardiorespiratory systems were still functioning, and in shutting off the respirator. In support of this theory, the defendant presented the testimony of a doctor and a priest, who rejected the medical concept of brain death. Both witnesses maintained, *inter alia,* that brain death, under the present state of technology, could never be accurately and conclusively diagnosed until after the cardiorespiratory systems have failed, and that Berger's death was caused by the transplant surgery and the discontinuance of the respirator.

At the conclusion of the testimony, the defense counsel requested that the trial court charge the jury concerning the

definition of death as follows: "Death, under our law, is the ceasing of life. That is, the irreversible and complete cessation of all bodily functions. This traditionally has meant the absence of heartbeat and breathing. The cessation of spontaneous heart function constitutes death * * * Brain death is not an acceptable or an allowable definition of death in New York State". The trial court refused to so charge. Instead, it charged, *inter alia,* that:

"In this case the People contend that Richard Berger was dead when he satisfied the medical criteria for brain death at the Smithtown General Hospital and when he was subsequently declared brain dead at the University Hospital at Stony Brook. They further contend that the cause of death of Richard Berger was anoxic cerebral necrosis due to a bullet wound of the head and brain. On the other hand, the defendant Lai contends that Richard Berger was not dead until such time as several of his organs were removed for transplantation purposes and the ventilator was disconnected which then caused the cessation of all bodily organic functions. They *[sic]* further contend that while the gunshot resulted in a mortal wound to Richard Berger, the death of Richard Berger was caused by another intervening event. This is the surgical removal of his organs and the disconnection or the termination of the use of the respirator or ventilator.

"While the legislature of the State of New York has not defined [death] as brain death or otherwise, it is a question of fact for you, the jury, to decide whether Richard Berger was dead from the gunshot wound to his head before the removal of his organs and the shutting down of the respirator or ventilator. This decision will be based upon the credible evidence which you choose to accept. That is, the testimony of the People's witnesses that brain death as defined constitutes death, and, accordingly, that Richard Berger was in fact dead before the removal of his organs; or the testimony of the defendant's witnesses that brain death as defined by the People's witnesses does not constitute death".

On appeal, the defendant argues, *inter alia,* that the trial court committed reversible error in refusing to define death to the jury, in accordance with long-standing tradition, as the failure or cessation of the circulatory and respiratory systems. The defendant argues that he may have been prejudiced if the jury erroneously accepted a "brain death" definition of death.

We disagree with defendant's argument. In *People v Eulo* (63 NY2d 341, 355-356) the Court of Appeals held as follows: "Ordinarily, death will be determined according to the tradi-

tional criteria of irreversible cardiorespiratory repose. When, however, the respiratory and circulatory functions are maintained by mechanical means, their significance, as signs of life, is at best ambiguous. Under such circumstances, death may nevertheless be deemed to occur when, according to accepted medical practice, it is determined that the entire brain's function has irreversibly ceased." In *People v Eulo (supra,* at 358), the Court of Appeals defined death as "irreversible cessation of breathing and heartbeat or irreversible cessation of the entire brain's function". Consequently, even if the trial court had chosen to formally define death, any such definition would have provided that death occurs upon cardiorespiratory failure or upon irreversible cessation of brain function. In any event, the defendant suffered no prejudice since the charge, as given, clearly and properly conveyed to the jurors that it was for them to determine, as an issue of fact, whether death occurred at the time of brain death, as the People argued, or when the cardiorespiratory failure occurred, as the defendant argued *(see, People v Eulo, supra).*

We have examined the defendant's remaining contentions and find them to be without merit. Mangano, J. P., Thompson, Kunzeman and Sullivan, JJ., concur.