OPINION OF THE COURT
John A. Milano, J.
Long Island Jewish Hospital (hereinafter LIJ), the petitioner in this action, moved this court on February 26, 1996 with an emergency order to show cause seeking authorization for LIJ to withdraw artificial respiratory support from a five-month-old baby girl who LIJ claimed was brain dead. The order to show *577 cause was signed by this court, on an expedited basis, with a return date of February 28, 1996. On the return date this court carefully reviewed the order to show cause of LIJ and a newly submitted memorandum, as well as the affidavit in opposition submitted by the parents of the baby. Oral arguments were scheduled.
In support of its application, LIJ submitted the affidavits of two board-certified pediatric specialists, Dr. Silver and Dr. Novak. In sum, both doctors certified that after several days of intensive medical care and extensive clinical testing, the baby had died. Paragraph 10 of Dr. Novak’s affidavit in support of the order to show cause stated: "The results of these clinical examinations of the EEGs, and of the apnea test were all consistent with a diagnosis of brain death, according to accepted medical standards and to LIJ’s policy. Thus, these tests unequivocally demonstrated that the baby was dead.”
At the oral argument, counsel for LIJ advised the court that he had just received the report of Dr. James Goodrich, the medical expert retained by the baby’s parents. Dr. Goodrich had just completed an examination of the baby at LIJ. Dr. Goodrich essentially confirmed the medical contentions of LIJ. Dr Goodrich found, in pertinent part, "brain death without evidence of higher cortical or brain stem function.” The medical conclusions of both the LIJ experts and that of the parents’ expert were consistent with a determination of death as set forth in 10 NYCRR 400.16.
The issue of when human life terminates is something which has become increasingly difficult for the legal community in light of the medical community’s ability to artificially maintain certain bodily functions of an otherwise lifeless body, through the use of sophisticated machines. The courts and Legislatures of the various States have been struggling with the legal issue of when life terminates for the past 20 years. In New York, apparently the first time the Court of Appeals addressed this issue was in the dual cases of People v Eulo/ People v Bonilla (63 NY2d 341 [1984]). Interestingly, these cases arose out of appeals of criminal prosecutions concerning defendants who had shot their victims in the head, leading to the death of the victims. The major issue before the Court was a determination of the cause of death which was related to when the victims had died. In its attempt to rule on these issues, Chief Judge Cooke, writing for the Court, stated (at 354), "In New York, the term 'death’, although used in many statutes, has not been expressly defined by the Legislature. This raises the question *578 of how this court may construe these expressions of the term 'death’ in the absence of clarification by the Legislature.” Judge Cooke later observed (at 355), "[I]t has been called to this court’s attention that the Legislature has, on a number of occasions, had bills before it that would expressly recognize brain-based criteria for determining death and has taken no affirmative action [citation omitted].”
In the absence of such legislation the court did arrive at its own determination of the termination of life which became the standard for that time. The Court held (at 357-358), "when a determination has been made according to accepted medical standards that a person has suffered an irreversible cessation of heartbeat and respiration, or, when these functions are maintained solely by extraordinary mechanical means, an irreversible cessation of all functions of the entire brain, including the brain stem, no life traditionally recognized by the law is present in that body.” Subsequent to the issuance of the Eulo decision (supra), the Governor established the New York State Task Force on Life and the Law. The Task Force, composed of experts in a number of fields, deliberated for some 18 months before releasing their report in 1987. The report concluded, essentially, that it was unnecessary for the Legislature to enact a statutory definition of termination of life as the Eulo standard was sufficient. The Task Force did conclude, however, that a standard should be promulgated by the Department of Health.
That standard was in fact promulgated, later that year, and was designated 10 NYCRR 400.16. This section remains in effect today.
Apparently, the only case ever reported, where a court has had to make a determination of termination of life, based upon this regulation, is Matter of Alvarado v New York City Health & Hosps. Corp. (145 Misc 2d 687 [Sup Ct, NY County 1989]). In Alvarado, the legal issues were similar to those now before this court, except that in Alvarado, the moving parties were the baby’s parents, who moved to enjoin the hospital from terminating life support of the body of their child whom the hospital alleged was dead.
In Alvarado, the court analyzed the development of the law concerning determination of the termination of life. This analysis addressed 10 NYCRR 400.16 and upheld its constitutionality. Applying section 400.16 to the case before it, the court ruled that the baby was in fact brain dead, that the hospital had followed proper procedures set forth in that section, and *579 the court had "no authority to intervene in what is a wrenching and heart rending decision to be made by the hospital”. (Supra, at 698.)
The Alvarado decision (supra) was immediately appealed to the Appellate Division, First Department. Prior to the Appellate Division considering the appeal, the parties entered into a consent order which vacated the Supreme Court decision and resulted in dismissal of the appeal as being academic. (Matter of Alvarado v New York City Health & Hosps. Corp., 157 AD2d 604 [1st Dept 1990].) The predicate for the hospital’s consent to the vacatur was that it made new medical findings that were inconsistent with a finding of brain death as set forth in section 400.16. The hospital also agreed to seek judicial review before disconnecting life support systems should it later determine that the baby had in fact become brain dead pursuant to section 400.16.
Notwithstanding the vacatur of the Supreme Court order in Alvarado (supra), based upon a change of factual circumstances, this court concurs that section 400.16 is constitutional and a properly promulgated regulation. There is no dispute between the parties, now before this court, that section 400.16 is the controlling legal authority.
Turning now to the specifics of the regulation, subdivision (a) of section 400.16 provides for a determination of death of an individual who has sustained either: (1) irreversible cessation of circulatory and respiratory functions; or (2) irreversible cessation of all functions of the entire brain, including the brain stem. Subdivision (b) provides that the determination of death must be made in accordance with accepted medical standards.
Clearly the affidavits and reports of the LIJ experts, Dr. Silver and Dr. Novak, demonstrate an "irreversible cessation of all functions of the entire brain including the brain stem”. There is nothing to indicate that their findings were anything other than "made in accordance with accepted medical standards.”
The next relevant portion of section 400.16 is subdivision (d) which provides "Prior to the completion of a determination of death of an individual in accordance with paragraph (a) (2) of this section, the hospital shall make reasonable efforts to notify the individual’s next of kin or other person closest to the individual that such determination will soon be completed.” No claim can be made that LIJ did not keep the parents notified of its position with regard to the status of the baby. LIJ contends that they repeatedly beseeched the parents to retain their own *580 expert to examine the baby. The court notes also that the father is an anesthesiologist and the.mother is an attorney. No claim can be made that they did not understand the nature of the hospital’s actions. Finally, although LIJ contends that they have no legal obligation to seek judicial determination of termination of life, it was LIJ who instituted this judicial proceeding.
After having been served with the order to show cause and on the morning of the return date thereof, the parents did in fact arrange for their own expert to examine the baby. As previously set forth in this decision, the report of the parents’ expert, Dr. Goodrich, was presented to this court during the hearing and did in fact confirm the findings of brain death made by the LIJ experts.
During the hearing, the parents’ attorney protested that LIJ did not have any written policy regarding determination of death as provided in subdivision (e) of section 400.16. That subdivision provides
"(e) Each hospital shall establish and implement a written policy regarding determinations of death in accordance with paragraph (a) (2) of this section. Such policy shall include:
"(1) a description of the tests to be employed in making the determination;
"(2) a procedure for the notification of the individual’s next of kin or other person closest to the individual in accordance with subdivision (d) of this section; and
"(3) a procedure for the reasonable accommodation of the individual’s religious or moral objection to the determination as expressed by the individual, or by the next of kin or other person closest to the individual”.
Attached to the order to show cause, as exhibit B, is a copy of a portion of the LIJ Administrative Procedure and Information Manual. The subject of that portion of the manual is designated "Determination of Brain Death”.. The effective date of that portion of the manual was March 15, 1995, nearly a year before the admission of the baby to LIJ.
Having reviewed that portion of the manual this court finds compliance with subdivision (e) (1) and subdivision (e) (2). LIJ’s actions were consistent with the procedures set forth in those subdivisions.
The manual portion presented did not however address subdivision (e) (3) which provides for "reasonable accommodation”. To strictly comply with section 400.16, the LIJ manual *581 must be supplemented to address, in writing, the "reasonable accommodation” requirements of subdivision (e) (3).
Having found that LIJ did not have a written policy regarding "reasonable accommodation” this court must next address whether LIJ did, in fact, provide "reasonable accommodation”. Reviewing the specific facts of this situation it is clear that LIJ kept the parents informed of the condition of the baby. It is also undisputed that the LIJ doctors were available for consultation by the anesthesiologist father, that LIJ encouraged the parents to seek a second opinion from an expert of their own choosing and were prepared to cooperate with any expert of the parents. When LIJ came to the conclusion that the baby was irretrievably brain dead, they did not simply "pull the plug” on their own accord, but sought judicial intervention which gave the parents a forum to express their own position. Throughout this court’s involvement in this proceeding LIJ expressed a willingness, and even a preference to transfer the baby to a different facility of the parents’ choosing, in lieu of obtaining judicial imprimatur to "pull the plug”.
Although this court has found that LIJ must promulgate a written policy regarding "reasonable accommodation” in order to strictly conform to section 400.16 (e) (3), this court must also conclude that LIJ did in fact afford the baby’s parents with "reasonable accommodation” in light of their religious and moral beliefs.
This court has carefully considered the extensive arguments of respective counsel made in open court. At the close of argument, counsel and the parents met with the court in its chambers. After consideration of all of the pertinent factors as contained in the oral argument as well as the papers, memoranda and supporting documents, this court comes to the conclusion that pursuant to the guidelines set forth in 10 NYCRR 400.16, the baby must be considered brain dead, with no chance of recovery. Accordingly, the application of LIJ is granted to the extent of authorizing LIJ to withdraw artificial respiratory support from the baby. This court sympathizes with the religious convictions of the parents but, under the circumstances, the law of this State requires the ruling made by this court.
Upon application of the parents, and over the objection of LIJ, the execution of this order is stayed through 5:00 p.m., March 7, 1996.