COURT OF APPEALS,

Jan. 5, 1915.

# THE PEOPLE v. ROBERT KANE.

(213 N. Y. 260.)

(1.) MURDER—DEATH NEED NOT BE IMMEDIATE.

Liability for homicide does not depend upon the death being the *immediate* consequence of the injury. If a felonious assault is operative as a cause of death, the causal co-operation of erroneous surgical or medical treatment does not relieve the assailant from liability for the homicide. It is only where the death is solely attributable to the secondary agency, and not at all induced by the primary one, that its intervention constitutes a defense.

(2.) SAME—WHEN DEFENDANT NOT RELIEVED FROM LIABILITY—BY IMPROPER MEDICAL AND SURGICAL TREATMENT.

If a dangerous wound is inflicted and death results, the person who inflicted the wound is criminally responsible for the death, although the person wounded neglected to use proper remedies; or refused to submit to a necessary operation; or dies after such operation was carefully and properly performed. If, however, a wound is given which is not in itself mortal or dangerous, but which from improper treatment becomes the cause of death, the person who gave the wound will not be criminally responsible for the death, *if it clearly appears that the death was caused by the improper treatment.*

(3.) SAME.

The defendant inflicted two pistol wounds on the body of a young married woman who was pregnant at the time. The evidence warranted the jury in finding, and their verdict shows they found, that the pistol-shot wounds inflicted by the defandant caused a miscarriage, the miscarriage caused septic peritonitis, and the septic peritonitis thus induced caused the woman's death on the third day after she was shot. Based on the testimony given by the medical witnesses and nurses called in behalf of the People, and the

contents of the hospital charts, the defendant insisted that the evidence failed to establish any causal connection between the wounds and the death; but that, on the contrary, it showed that death was due to the intervention of an outside agency, namely, negligent and improper medical and surgical treatment at the hospital. *Held*, that the evidence being sufficient to warrant the finding that the wounds inflicted by the defendant operated as causes of death even though the medical treatment may also have had some causative influence, the record discloses no error in this respect.

(4.) SAME—DYING DECLARATIONS.

Attention is called to the effects which may follow the use of printed forms for dying declarations, unless extreme care is taken by the interlocutor to impress upon the wounded person the character of the preliminary inquiries relating to the anticipation of death. In order to render declarations of the deceased competent evidence, it must be proved, among other things, that the declaration was not made in answer to interrogatories calculated to lead the deceased to make any particular statement. This rule applies to the statements of the wounded person in regard to his hope of recovery as much as to his statement respecting the identity of his assailant.

(Argued October 19, 1914; decided January 5, 1915.)

APPEAL from a judgment of the Supreme Court, rendered June 24, 1914, at a Trial Term for the county of Kings, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*Edward J. Reilly* for appellant.

The verdict should be set aside and a new trial granted inasmuch as the verdict is against the weight of evidence. The evidence produced did not justify the jury in finding the defendant guilty of murder in the first degree. (People v. Lawton, 56 Barb. 126; People v. Pisano, 142 App. Div. 524; People v. Du Veau, 105 App. Div. 387; People v. Conrad, 102 App. Div. 570; People v. Gardner, 144 N. Y. 199; People v. Kennedy, 159 N. Y. 354.) It was error to admit in evidence the state-

ment taken by the coroner, as it was not a dying declaration. (Greenl. on Ev. [16th ed.] § 157.)

*James C. Cropsey, District Attorney (Ralph C. Hemstreet and Hersey Egginton of counsel), for respondent.*

The evidence produced justified the jury in finding the appellant guilty of murder in the first degree. (People v. Sutherland, 154 N. Y. 345; Cox v. People, 80 N. Y. 500; Comm. v. Hackett, 84 Mass. 136; Comm. v. Eisenhower, 181 Penn. St. 471; State v. Strong, 153 Mo. 548; Downing v. State, 114 Ga. 30; Daughdrill v. State, 113 Ala. 34; Crum v. State, 64 Miss. 1; State v. Foote, 58 S. C. 218; Clark v. Commonwealth, 90 Va. 360.) The statement made by Anna Klein to Coroner Wagner was properly admitted in evidence as a dying declaration. (People v. Chase, 79 Hun, 296; 143 N. Y. 669.) No reversible error is to be found in the charge. (Rew's Case, J. Kelyng, 26; Cox v. State, 80 N. Y. 500; Commonwealth v. Eisenhower, 181 Penn. St. 471; State v. Strong, 153 Mo. 548; Commonwealth v. Hackett, 84 Mass. 136; Downing v. State, 114 Ga. 30; Daughdrill v. State, 113 Ala. 34; Crum v. State, 64 Miss. 1; State v. Foote, 58 S. C. 218; v. Clark v. Commonwealth, 90 Va. 360.)

WILLARD BARTLETT, Ch. J.:

On the afternoon of May 20th, 1914, at 35 Varick avenue in the borough of Brooklyn, the defendant inflicted two serious pistol-shot wounds on the body of Anna Klein, a young married woman about twenty-two years of age, who was then living with her grandmother at the house where the shooting occurred. Anna Klein was pregnant at the time. The evidence warranted the jury in finding, and their verdict shows they must have found, that the pistol-shot wounds inflicted by the defendant caused a miscarriage, the miscarriage caused septic peritonitis,

and the septic peritonitis thus induced caused Anna Klein's death on the third day after she was shot.

The defendant, who described his occupation as that of an engineer's assistant, was twenty-nine years old at this time, and had served as a first-class fireman in the United States navy. Upon leaving the navy, in 1911, he married a girl in New York, but left her at the end of their first week of marriage; and thereafter he appears to have lived with his wife only occasionally and for comparatively brief periods of time. Anna Klein was also married but did not live with her husband. The defendant made her acquaintance while he was working for the Long Island Railroad Company at its freight station in Brooklyn, and illicit relations were soon established between them, and continued in St. Louis where they went to live. In 1913 they returned to Brooklyn, Anna Klein going to her mother's and the defendant rejoining his wife. Inspired by jealousy, the wife on one occasion attempted to shoot Anna, when the defendant, according to his account of the occurrence, tore the revolver from her hand and thus defeated her purpose. The defendant, nevertheless, was arrested for participation in the attempted assault by his wife, and was detained in jail eight days, when he was discharged, upon the refusal of the grand jury to indict him. It was the theory of the prosecution that the defendant regarded Anna Klein as largely responsible for his imprisonment on this occasion, and that this was one of the causes which led him to determine to kill her.

He did not return to work after thus being in custody, but, according to his own testimony given upon the trial, he spent his time roaming around and drinking, being disgusted and discouraged at the treatment he had received. Anna Klein's grandmother, at whose house the shooting took place, testified that the defendant came there on the night of the 16th of May, and that she " chased him out." She saw him subsequently on the

admits having purchased a revolver about a fortnight before the shooting, though he was unable to assign any reason for buying it.

The circumstances of the shooting were related by Anna Klein in her dying declaration as follows: "On Wednesday, May 20, Robert Kane was standing on the corner of Varick avenue and Harrison place in the saloon vestibule. About three o'clock when I saw him, Robert Kane, standing there, I went back home, and told my grandmother that Robert Kane was there. Then I wanted to go out to my mother's, who lives at 31 Varick avenue. As I opened the door to go out into the street, Robert Kane opened the door at the same time. As soon as he got into the vestibule, he pulled out a gun from his pocket and says to me, 'I want to speak to you.' I said, 'You can speak to me if you do not raise a disturbance.' So he said he wanted to talk to me in private and I then said, 'You can't. My grandmother and everybody else must be there.' He kept on talking so that I could not call a policeman as I did the last time. My grandmother then came out and asked if he had a pistol. I said 'Yes' and my grandmother then went out and called my mother. My mother then chased him out of the vestibule. As he stepped out of the vestibule, he turned and fired four shots out of the vestibule. Three shots took effect. Robert Kane then walked to the saloon corner from where he came. I don't know what happened then. I then identified him as Robert Kane, the man who shot me."

This narrative of the tragedy was corroborated by the mother and grandmother, both of whom were eye-witnesses, and also by Mrs. Mary Meyer, of 31 Varick avenue, who went over with the mother to No. 35, when she learned that Robert Kane was there. This witness stated that he was standing "right close" to Anna Klein when he shot the first time, having hold of her elbow with his left hand. The mother testified he fired one shot at her daughter after she had fallen to the ground.

The defendant, testifying in his own behalf, declared that the shooting was all an accident; that, although he fired into the vestibule, he did not intend to kill anybody, but merely wanted to scare the persons there and keep them in, and thus prevent his own arrest.

The jury rejected this explanation of his conduct. In doing so they were doubtless influenced by the statements made by him just after the shooting, in answer to questions by Assistant District Attorney Conway of Kings county at the Stagg Street police station. The defendant, after being fairly warned that anything he said might be used against him, identified his revolver as the weapon with which he had fired five times at Anna Klein on that day. The following are extracts from the stenographic transcript of his statement on that occasion:

" Question: That is the revolver you bought two weeks ago?

" Answer: Yes, sir.

" Question: Did you carry this revolver around with you for the last two weeks?

" Answer: Yes, sir.

" Question: You never left it at home?

" Answer: Yes, sir; I left it at home.

" Question: When did you put it in your pocket after you left it at home? Yesterday?

" Answer: This morning when I went out.

" Question: Did you tell your wife where you were going?

" Answer: Yes, sir.

" Question: What did you tell her?

" Answer: Told her I was going over to Jersey; to take that gun over to Jersey.

" Question: That was not true?

" Answer: No, sir.

" Question: What were you going to do?

" Answer: I was going to come over here to Brooklyn and shoot Anna Klein with it. * * *

" Question: What did you say to her before you shot her?

" Answer: I went in there and said, ' I want to speak to you by yourself a minute.'

" Question: What did she say?

" Answer: She said, ' All right. Wait until I get my grandmother and grandfather out of here.'

" Question: What did you say?

" Answer: I didn't say nothing; I just stayed there for a couple of minutes.

" Question: Then what happened?

" Answer: Then I saw the grandfather stick his head out of the window to call a cop, to have me arrested again and before I got arrested and go to jail for nothing, like I did the other time, I would do a good job and do something to go to jail for. * * *

" Question: What were you going to do with the five extra shells?

" Answer: I was going to use them if I had a chance to.

" Question: On whom?

" Answer: On anybody that got in front of me.

" Question: That is, on anybody that prevented you from escaping, from getting away?

" Answer: I do not know about that. I had them three shells and I had seven with the gun and I had five in my pocket. I do not know whether I would have used them or not.

" Question: When you told Anna Klein you wanted to speak to her for a minute, did you ask to see her alone?

" Answer: Yes, sir.

" Question: What was your idea in getting her to see you alone?

" Answer: I just wanted to speak to her.

" Question: Did you think you would have a better chance of getting away?

" Answer: No, if I wanted to kill anybody, I would kill them if there was a regiment around me.

" Question: That was the way you felt to-day?

" Answer: That was the way I felt, yes. I know what a man will get, if he commits murder.

" Question: What will he get?

" Answer: The electric chair.

" Question: You knew that before you shot her?

" Answer: I read it enough in the newspapers to know that a man that commits a deliberate murder, he will get the electric chair.

" Question: You were willing to take that chance?

" Answer: Yes, I do not look for any sympathy whatever.

" Question: But you do not want to tell me why you shot her?

" Answer: I would not tell you that. You will do me a great favor it you do not try to make me."

At this point the assistant district attorney very properly ceased to inquuire further, having already assured the witness that he was not required to answer any questions to which he objected.

It is true that when the defendant came to testify he denied having made some of the responses we have quoted which bore most strongly against him. He did not remember saying he was going to come over to Brooklyn and shoot Anna Klein; and he swore positively that he never had any such intention. According to his account of the occurrences in the vestibule, Anna Klein readily assented to the interview which he desired, when her mother appeared on the scene—the grandfather and grandmother having retired into the background—and threatened the defendant with arrest, at the same time seizing him by the arm. She was about starting for a policeman when he shot

into the vestibule "to scare them," as he said, and without intending to kill any one. He admitted having a faint recollection of being brought back to Anna when she was lying down but could not remember things thoroughly after that.

In this condition of the record, it was for the jury to determine which version of the occurrence was the true one—that given by the defendant on the witness stand or that presented by the case for the prosecution, including the inferences to be drawn from his admissions to the assistant district attorney, as recorded by the stenographer at the time they are alleged to have been made. We cannot say that they were wrong in concluding that the latter represented the truth beyond all reasonable doubt.

The chief position assumed by the defense, however, upon the present appeal, as it was upon the trial, is that the defendant's shots were not proved to be the cause of Anna Klein's death. It matters not that the shooting was intentional and premeditated and deliberate, if it did not effect the death of the person shot. Of the five shots fired by the defendant three struck the deceased. One of the bullets merely came into contract with the skin without penetrating it, and that shot may be left out of consideration on this branch of the case. The second bullet lodged in the back, three inches from the spine. The third entered the right arm, passed inward puncturing and fracturing the sixth rib, and lodged in the lower lobe of the right lung, where it was found. The wounded woman was taken to St. Catherine's Hospital in Brooklyn for treatment. She died there three days later, and the coroner's physician who performed the autopsy testified that the cause of her death was a pistol shot wound penetrating the lung and a septic peritonitis following an abortion (miscarriage). In behalf of the defendant it was insisted that the evidence failed to establish any causal connection between the wounds and the death; but that, on the contrary, it showed that death was due to the inter-

vention of an outside agency, namely, negligent and improper medical and surgical treatment at the hospital.

This contention is based wholly on the testimony given by the medical witnesses and nurses called in behalf of the People, and the contents of the hospital charts. Soon after her arrival the patient complained of abdominal pains; at 2 o'clock the next morning vaginal bleeding was observed; and ergot appears to have been administered to check this. Counsel for the defendant attributes the miscarriage which followed to the action of this ergot; but no opinion evidence was adduced in support of his view in this respect, and, on the other hand, Dr. George Bodkin, the assistant visiting surgeon connected with the hospital, gave opinion evidence to the effect that the miscarriage was caused by the shock of the shooting. " To begin with," this witness said, " the shooting, the bullet wounds, and the shock and fright attached to it or connected with it were, in my opinion, responsible for the miscarriage; the miscarriage resulted in a septic peritonitis; and the septic peritonitis resulted in her death." After the miscarriage, the uterus was packed with gauze to prevent further bleeding; and this procedure is bitterly denounced in the brief for the appellant, where it is asserted that the packing produced the septicæmia which proved fatal. The jury, however, could hardly be expected to adopt this view in the absence of any medical testimony to the effect that the septic condition was or could have been thus developed. Upon the evidence in the case such a finding would have been purely speculative.

As to this portion of the defense, which counsel contended reduced the charge to an attempt to commit murder, the learned trial judge instructed the jury as follows: " The defendant claims that he did not kill this girl. * * * That is a question of fact which the jury have to determine. I will say this to you, gentlemen: that if that shooting was the cause of a miscarriage and if the result of the miscarriage was death, even

though there may have intervened some disease, like blood-poisoning, then, if that relation of cause and effect is traceable from the shooting of this girl right up to the point of her death, it caused her death in the eyes of the law. That is a question of fact. The responsibility of determining that question of fact rests upon you. * * * If the chain of cause and effect runs from the shots right up to the death, then, although there may have been subsidiary causes due to the pregnant condition of this woman, such as blood-poisoning resulting from a miscarriage which was produced by the wound, then, even though those subsidiary causes existed, the defendant is responsible in the eyes of the law for all the consequences of his act. If the woman was pregnant and was peculiarly susceptible to injury from a gunshot wound, he cannot take refuge behind that. Of course, in order to find his responsibility, you must find that the gunshot wound caused her death. In other words, you must find, either that the gunshot wound directly caused her death or that the gunshot wound was the cause of the miscarriage and the miscarriage caused her death: if that relation of cause and effect existed then he is responsible for her death. * * * When one person wounds another in a part of the body in which the wound may result in serious injury, and death follows, it becomes a question of fact whether, under all the circumstances, the death is the result of that wound. I am going to leave that question to you, gentleman."

In ruling upon the requests to charge the court consistently adhered to these instructions concerning the contention that death was due to a secondary intervening cause; so that if these instructions were correct no error was committed in dealing with this phase of the case.

We think they were correct. They accord with the uniform current of authority in those jurisdictions where the question has been passed upon, and enunciate the rule as derived by the leading text writers from such authoritative decisions.

If a felonious assault is operative as a cause of death, the causal co-operation of erroneous surgical or medical treatment does not relieve the assailant from liability for the homicide. It is only where the death is solely attributable to the secondary agency, and not at all induced by the primary one, that its intervention constitutes a defense. Thus, if the internes at St. Catherine's Hospital had carelessly killed Anna Klein by the negligent administration of a deadly poison, the defendant would not have been liable for her death, though he would still have remained responsible for the assault; but he was liable for killing her, if the jury were satisfied, as they must have been, that no matter what was done at the hospital, the pistol-shot wounds which he inflicted operated to cause her death.

That liability for homicide does not depend upon the death being the *immediate* consequence of the injury was clearly held in Cox v. People (80 N. Y. 500), where it was contended that the deceased died from fright and not from the assault alleged in the indictment. The court charged the jury that " if the deceased died from fright, and if the fright was caused by the violence of the prisoner he is as responsible, and can as properly be convicted under this indictment of murder in the first degree as if the immediate result of his act was suffocation." This instruction was upheld by the Court of Appeals, which said, by ANDREWS, J.: " It was not necessary in order to convict the prisoner that it should appear that his actual personal violence was the sole and immediate cause of the death of the deceased. If his violence so excited the terror of the deceased that she died from the fright, and she would not have died except for the assault, then the prisoner's act was in law the cause of her death." (p. 515.)

The earliest consideration given by the courts in England to the negligent treatment of the wounded person as an excuse for one subsequently accused of homicide appears to have been in Rew's Case (Kelyng's Reports 26) in the reign of Charles

II, wherein one Edward Rew was indicted for killing his brother, and upon the evidence it was resolved " that if one gives wounds to another who neglects the cure of them, or is disorderly, and doth not keep that rule which a person wounded should do; yet if he die it is murder or manslaughter, according as the case is in the person who gave the wounds, because if the wounds had not been, the man had not died; and therefore neglect or disorder in the person who received the wounds, shall not excuse the person who gave them." This is in accordance with the rule as laid down by Hawkins: " But if a Person hurt by another die thereof within a Year and a Day, it is no Excuse for the other that he might have recovered if he had not neglected to take Care of himself." (Hawkins' Pleas of the Crown, bk. 1, ch. 13, § 10.)

The law of England as it exists to-day is thus stated in Lord Halsbury's elaborate work as follows: " If a dangerous wound is inflicted and death results, the person who inflicted the wound is criminally responsible for the death, althought the person wounded neglected to use proper remedies; or refused to submit to a necessary operation; or died after such an operation which was carefully and properly performed. If a wound is given which is not in itself mortal or dangerous, but which from improper treatment becomes the cause of death, the person who gave the wound will not be criminally responsible for the death, *if it clearly appears that the death was caused by the improper treatment.*" (9 Halsbury's Laws of England, 572.)

Among the cases cited in support of this statement of the law is Reg. v. Holland (2 Moody & R. 351), which was tried before MAULE, J., at the Liverpool assizes in 1841. The prisoner was indicted for murder by having inflicted divers mortal blows and wounds upon one Thomas Garland, including a cut upon one of his fingers. Garland refused to allow the finger to be amputated, although the attending surgeon advised him that he would imperil his life by his refusal. He eventually died of lock-

jaw. On the trial it was contended in behalf of the prisoner that the cause of death was not the wound which he had inflicted, but was the obstinate refusal of the deceased to submit to surgical treatment which would have averted the fatal result. Mr. Justive MAULE, however, instructed the jury that if the prisoner willfully and without any justification inflicted the wound which was ultimately the cause of death, the prisoner was guilty of murder; that for this purpose it made no difference whether the wound was in its own nature instantly mortal or whether it became the cause of death by reason of the deceased not having adopted the best mode of treatment, and that the real question was whether in the end the wound inflicted by the prisoner was the cause of death.

Where the wound or injury has contributed mediately or immediately to the death of the death of the injured person and the injury was neglected or mismanaged, to warrant the escape of the person inflicting the injury from the responsibility for the killing, the subsequent neglect or mismanagement must have been the sole cause of death.   (Wharton on Homicide [3d ed.], p. 41.)

In 2 Bishop on Criminal Law (§ 637 *et seq.*) it is stated: " Whenever a blow is inflicted under circumstances to render the party inflicting it criminally responsible if death follows, he will be deemed guilty of the homicide though the person beaten would have died from other causes, or would not have died from this one had not others operated with it; provided the blow really contributed either mediately or immediately to the death in a degree sufficient for the law's notice." (§ 637.)

" And the doctrine is established, that if the blow caused the death, it is sufficient, though the individual might have recovered had he used proper care himself; or submitted to a surgical operation, to which he refused submission; or had the surgeons treated the wound properly." (§ 638.)

" But where the wound is not of itself mortal, and the party

dies in consequence solely of the improper treatment, not at all of the wound, the result is otherwise. And it is the same if the wounded person becomes sick and dies of an independent disease, not connected with the wound, which was not mortal. But we should not suffer these propositions to carry us too far; because, in law, if the person dies by the action of the wound, and by the medical or surgical action, jointly, the wound must clearly be regarded sufficiently a cause of the death." (§ 639.)

In Commonwealth v. Hackett (2 Allen, 136) the defendant was convicted of murder by stabbing. He contended that the evidence showed that the wound of the deceased was unskillfully and improperly treated by the surgeons. BIGELOW, Ch. J., after quoting from the English authorities, said: "The well established rule of the common law would seem to be, that if the wound was a dangerous wound, that is, calculated to endanger or destroy life, and death ensued therefrom, it is a sufficient proof of the offence of murder or manslaughter; and that the person who inflicted it is responsible, though it may appear that the deceased might have recovered if he had taken proper care of himself, or submitted to a surgical operation, or that unskillful or improper treatment aggravated the wound and contributed to the death, or that death was immediately caused by a surgical operation rendered necessary by the condition of the wound. The principle upon which this rule is founded is one of universal application and lies at the foundation of all our criminal jurisprudence. It is, that every person is to be held to contemplate and to be responsible for the natural consequences of his own acts. If a person inflicts a wound with a deadly weapon in such manner as to put life in jeopardy, and death follows as a consequence of this felonious and wicked act, it does not alter its nature or diminish its criminality to prove that other causes cooperated in producing the fatal result. Indeed, it may be said that neglect of the wound or its unskillful and improper treatment, which

were of themselves consequences of the criminal act, which might naturally follow in any case, must in law be deemed to have been among those which were in contemplation of the guilty party, and for which he is to be held responsible."

In State v. Bantley (44 Conn. 537) the defendant inflicted a gunshot wound upon the deceased, who died eleven days thereafter of lockjaw. There was evidence of mismanagement or carelessness on the part of the attending physicians. Again the court, after citing many of the same authorities cited in the Hackett Case (*supra*), deduces the following rule: "If one person inflicts upon another a dangerous wound, one that is calculated to endanger and destroy life, and death ensues therefrom within a year and a day, it is sufficient proof of the offence either of manslaughter or murder, as the case may be; and he is none the less responsible for the result though it may appear that the deceased might have recovered if he had taken proper care of himself, or that unskillful or improper treatment aggravated the wound and contributed to his death."

In Commonwealth v. Eisenhower (181 Pa. St. 470) the killing was by shooting and there was evidence in the case that the attending surgeon treated the wound by means of a drainage tube which found its way into the spinal cord and thus caused death. The trial court in referring to this said: "But suppose it did, the prisoner cannot escape by showing that death was the result of an accident occurring in an operation which his felonious act made necessary. There is no pretense that the drainage tubes were not required or that they were improperly placed." This instruction was declared by the Supreme Court of Pennsylvania to be clearly correct.

In State v. Wood (112 Iowa, 411) the defendant was convicted of manslaughter for having committed homicide by means of an assault upon his victim with his fists and feet, inflicting mortal wounds of which the victim died. The latter had improved under medical treatment at first but subsequently

empyema set in resulting in his death. The appellant insisted that the evidence tended to show that but for mismanagement on the part of the physician he might have recovered, and that the jury should have been instructed, if they so found, that the accused could not be convicted of manslaughter. The Supreme Court of Iowa approved the rule applicable to such a case as thus stated by Greenleaf: "If death ensues from a wound given in malice, but not, in its nature, mortal, but which, being neglected or mismanaged, the party died, this will not excuse the prisoner who gave it." (3 Greenleaf on Evidence, § 139.) The court goes on to say: "The true reason for not allowing the defence is that the wound inflicted, though it may not have been the only cause, yet contributed, mediately or intermediately, to the death of the person assaulted. To warrant escape from the responsibility for the killing, the subsequent mismanagement or neglect must have been the sole cause of death. No principle is better settled than that he who, by his wrongful act, accelerates or hastens death, or contributes to its cause, is guilty of homicide; and whether this be murder or manslaughter necessarily depends on the intent or motive by which the person making it was actuated. The court rightly instructed that, if the injuries inflicted by the defendant directly contributed to produce empyema causing death, he was guilty of taking the life of the deceased; if these did not so contribute, he could not be convicted of murder or manslaughter."

In State v. Strong (153 Mo. 548) the wound was inflicted with a knife. An instruction by the trial court was approved which was to the effect that the jury might find the defendant guilty " notwithstanding you may also find and believe the testimony that unskilled medical treatment aggravated such wound and that deceased might have recovered if greater care and skill had been employed in treating him."

Further illustrations of the general rule as it has been stated

may be found in People v. Cook (39 Mich. 236) ; Kelley v. State (53 Ind. 311) ; Downing v. State (114 Ga. 30) ; Daughdrill v. State (113 Ala. 7, 34) ; State v. Foote (58 S. C. 218) ; Clark v. Commonwealth (90 Va. 360), and Coffman v. Commonwealth (10 Bush [Ky.], 495).

The instructions given to the jury by the learned trial judge on this phase of the case before us being in strict accordance with the settled law and the evidence being sufficient to warrant the finding that the wounds inflicted by the defendant operated as causes of death even though the medical treatment may also have had some causative influence, the record discloses no error in this respect.

The only other point which requires notice refers to the admission of the dying declaration of Anna Klein, taken by the coroner.

It appears from the evidence in the present case, and from the records in several other capital cases which have recently come before us, that a new custom has come into vogue among coroners in reference to dying declarations of victims of crime. A printed form is prepared by these officers for use in obtaining such declarations upon which the first question is: " Do you now believe that you are about to die? " Then follow these questions:

" Question: Have you any hope of recovery from the effects of the injury that you have received? "

" Question: Are you willing to make a true statement as to how and in what manner you came by the injury from which you are now suffering? "

This method of interrogation by reference to printed questions is not necessarily objectionable in itself provided the questions are put, not in a perfunctory manner, but in such a way as to impress the injured person with their true character and meaning. On the other hand, if the initial inquiry in refer-

ence to the patient's apprehension of death is slurred over and we have nothing but a careless assent, perhaps expressed only by a nod to the question, whether the patient now believes that he is about to die, there is an utter absence of the clear and un- equivocal expression of the certain conviction of impending death which the law has always demanded as an essential pre- requisite to the admission of unsworn declarations of fact which may be used to deprive a human being of his life. We do not say that the necessary emphasis was lacking in the present case. On the contrary, if those who testified to the dying declaration here may be believed the victim declared in express words that she felt she would die and that she had no hope of recovery from the effects of the injury which she had received. These state- ments afforded ample ground for the reception of the state- ment which followed as to the circumstances of the fatal shoot- ing. We deem it proper, however, to call attention to the un- toward effects which may follow the use of printed forms, such as we have mentioned, unless extreme care is taken by the in- terlocutor to impress upon the wounded person the character of the preliminary inquiries relating to the anticipation of death. As we have already intimated, if these are treated as merely formal and unimportant, without taking any pains to make sure that the injured person understands them, the safeguard which the law exacts in such cases may be entirely wanting—in the absence of certainty that the patient looks upon death as an inevitable consequence of the injury and will, therefore, be as likely to tell the truth under the influence of that apprehen- sion as he would be under the sanction of an oath calling God to witness that what he is about to say is true. In the case at bar the coroner who took the dying declaration, after testi- fying that he had a printed form and he took the questions from that form, said he had used as many as twenty of them for the purpose of taking dying declarations within the six

months preceding the trial.   His habit was to take the printed
slip containing five printed questions out of his pocket
and put the questions to the patient just as they were
on the slip.   It can readily be understood that a pactice
of this kind will be likely to degenerate into a mere per-
functory form; and we deem it proper to refer to the matter
in this way as a warning to those whose duties may call upon
them to attend dying victims of crime.   The precautions which
the law prescribes to insure the existence of a state of mind on.
the part of the declarant which will be equivalent to the state
of mind produced by the administration of a solemn oath, can-
not be too carefully observed.   If they are disregarded in the
slightest degree the evidentiary value of the declaration is
wholly destroyed.

In several of the states of the Union the reception in criminal
cases of dying declarations made under a sense of impending
death, is regulated by statute.   The Texas statute prescribes
that in order to render declarations of the deceased competent
evidence, it must be proved, among other things, that the dec-
laration was not made in answer to interrogatories calculated
to lead the deceased to make any particular statement.   (Texas
Code Crim. Pro. 1895, § 788.)   This is doubtless the rule in-
dependent of any statutory enactment; and it applies to the
statements of the wounded person in regard to his hope of re-
covery just as much as to his statement respecting the identity
of his assailant.

We find no error of law or fact in this case which calls for a
reversal of the judgment.   There was ample evidence of an
intent to kill; the necessary premeditation and deliberation
could well be found by the jury; and whether the treatment that
the wounded woman received at the hospital was all that it
should have been or not, the conclusion that the pistol-shot
wounds inflicted by the defendant were the cause of her death

was warranted by the proof and we cannot say that it was wrong.

The judgment of conviction should be affirmed.

WERNER, CHASE, COLLIN, HOGAN, MILLER and CARDOZO, JJ., concur.

Judgment of conviction affirmed.