OPINION OF THE COURT
Julian F. Kubiniec, J.
Defendant, Evelyn Vaughn, by notice of omnibus motion seeks various pretrial relief. Responding affidavit has been interposed by the People. At oral argument conducted before this court in Part 10, Erie County Supreme Court, on October 11, 1991 all issues were otherwise disposed of except the following which, upon review, I now decide as follows:
*732 SUFFICIENCY OF GRAND JURY PRESENTATION
This court has reviewed, in camera, a transcript of the testimony and exhibits presented to the Grand Jury. The factual scenario developed therein presents a uniquely troublesome issue involving the application of settled criminal law in the face of continued medical advancements in supporting and prolonging life.
During the late evening of May 24, 1991 the defendant allegedly stabbed Amelia Robinson with a three-inch pocket knife following a fist fight on the victim’s front porch.
On arrival at the trauma room at Erie County Medical Center the victim was found to be suffering from a stab wound to the upper abdomen and was in respiratory distress, with unstable vital signs and severe internal bleeding. On transfer to an operating table she suffered cardiac arrest attributable to an extreme loss of blood. Her left chest was opened, intravenous blood was supplied, and a heart massage was successful in reestablishing a heartbeat. Several liters of pooling blood was removed from the victim’s abdomen and a deep, through-and-through laceration of the liver was found and sutured. Because a drainage tube had been initially inserted in the right chest and owing to some injury to the right side of the diaphragm and bleeding from the right chest, that side was also opened and explored.
As is common in trauma cases involving massive loss and replacement of blood and body fluids, the entire cellular structure of the body is traumatized and considerable bodily swelling occurs such that it was impossible to close the victim’s several surgical incisions. Accordingly, teflon patches were employed to meet a closure. Several hours later, however, pressure within the victim’s abdomen increased to such a degree that the respirator was hindered in pumping air in and out of her lungs and further surgery was required to insert more teflon patches. These patches, however, created a further insult when, over time, they rubbed against bowel tissue creating several holes, thereby allowing bowel contents to leak over the surgical wounds. Several more surgeries were required to effect repairs.
Despite intense medical efforts, Amelia Robinson’s course of recovery proved rocky and although surgeons ultimately cleaned her abdomen and removed the teflon patches, her abdomen essentially remained open and small intestine fluid continued to leak. An abscess developed as did yeast and *733 staph infections which ultimately migrated, to her blood and became septic. Antibiotics were given. As a result of septic shock, inotropes were administered to stimulate the heart function and to elevate blood pressure. The victim initially responded well to this aggressive treatment but as soon as the antibiotics were stopped, she again became septic and this time did not respond to new antibiotics nor to the inotropes. Her blood pressure decreased to a point where her blood flow was insufficient to profuse her organs and she lapsed into multiple organ failure and developed acute respiratory distress syndrome whereby her lungs filled with fluid and became scarred and fibrotic. In the end, the victim was on maximum inotropes, including a last effort epinephrine drip, but her blood pressure could not be elevated to more than one third normal which was insufficient to maintain an adequate blood flow to her vital organs, her respiratory system was being artificially maintained and she was in a morphine induced coma.
On August 2, 1991, both the surgical team and the I.C.U. physician were of the opinion that, despite all extraordinary measures, Amelia Robinson was beyond medical help and would surely die within three to five days. That evening, some 70 days after her initial wounding, she expired from what the attending I.C.U. physician determined was, "cardiac arrest due to multiple systems organ failure, direct result of her injuries that brought her into the hospital”.
In the interim, on July 2, 1991 the defendant was indicted by an Erie County Grand Jury on charges of assault in the first degree (Penal Law § 120.10 [1]) and criminal possession of a weapon in the fourth degree (Penal Law § 265.01 [2]). Later on September 4, 1991 this same Grand Jury returned a superseding indictment recharging these counts and adding a charge of manslaughter in the first degree (Penal Law § 125.20 [I])-
Of considerable note is that during the latter Grand Jury proceedings the testimony of the attending I.C.U. physician Dr. Mark Baradziej was presented (and from whose testimony the above-stated medical history was gleened) as well as the testimony of a hospital aide and two registered nurses who attended the victim and other patients in the I.C.U. unit. Most compelling was the testimony of one of these nurses who was not on duty when Amelia Robinson expired, but who received a phone call within one to two hours of her death from a nurse who was in attendance and allegedly stated, "in sum *734 and substance * * * that she turned off the ventilator and the drips * * * because somebody had to have the balls to do it”. This nurse’s testimony seemingly reluctantly given with a memory described as vague, noted only that she "assumed” that Amelia Robinson was still alive when the life supports were turned off.
Dr. Baradziej testified that, if a nurse had momentarily discontinued intravenous medication or decreased the amount of oxygen flowing in the ventilator system, the patient may be put into cardiac arrest but that there was no medical way of telling if such a malicious act had occurred.
Critical to this court’s view of the sufficiency of the Grand Jury presentation is the fact that the People did not choose to provide any instructions on either "causation” or "intervening event.” Rather, the Assistant District Attorney in seeking the manslaughter indictment against the defendant stated: "Before I read you the section, I refer you obviously to Exhibit A, the death certificate and to the testimony of Dr. Baradziej who I would submit to you was pretty clear about the eventual prognosis absent any activity that [name deleted] may or may not have engaged in and therefore would ask you to consider criminal responsibility for the death going back to Evelyn Vaughn as the direct causation. Once you vote that, Mr. Marusak has some questions with respect to [name deleted].”
Eventually, a murder indictment was requested against the allegedly offending nurse and a "no bill” was returned.
The Grand Jury was thus asked to return a murder and manslaughter indictment against separate individuals whose alleged independent actions, at distinctly different times, resulted in the death of Amelia Robinson. The issue then: for the purpose of assessing criminal responsibility, may a person be found to have been twice killed? Or, if a jury chose to believe that hospital personnel had maliciously removed medical life supports from a mortally wounded stabbing victim thereby causing cessation of cardiorespiratory function, would the initial perpetrator be relieved of having feloniously caused another’s death?
An essential element in every homicide charge is that the People prove beyond a reasonable doubt that the defendant’s conduct caused the death of a person.
However, as noted by the Court of Appeals in People v Stewart (40 NY2d 692, 696 [1976], citing People v Kibbe, 35 NY2d 407, 412 [1974]), there is " 'no statutory provision *735 regarding the effect of an intervening cause of injury as it relates to the criminal responsibility of one who sets in motion the machinery which ultimately results in the victim’s death; and there is surprisingly little case law dealing with the subject’
In reviewing this issue, Stewart instructs us that causal conduct sufficient to warrant the imposition of criminal liability for homicide is that which directly "forge[s] a link in the chain of causes which actually brought about the death” (supra, at 697). Such direct cause would continue to hold defendant liable even if "other factors, entering after the injury, have contributed to the fatal result” (supra, at 697) but if " 'the death is solely attributable to the secondary agency, and not at all induced by the primary one * * * its intervention constitutes a defense’ ” (quoting People v Kane, 213 NY 260, 270 [1915]).
In Kane the defendant was held criminally responsible for causing the death of a pregnant woman upon whom he inflicted two gunshot wounds. These wounds caused the victim to miscarry, the miscarriage led to septic blood poisoning, possibly due to packing the uterus with gauze, resulting in death. The Court of Appeals found that the evidence was "sufficient to warrant the finding that the wounds inflicted by the defendant operated as causes of death even though the medical treatment may also have had some causative influence” (supra, at 277).
However, the court added that, if attending hospital personnel "had carelessly killed Anna Klein by the negligent administration of a deadly poison, the defendant would not have been liable for her death” (supra, at 270-271).
Therefore, in Stewart (supra) the defendant who had stabbed his victim was relieved of a homicide charge as the Court of Appeals concluded that the victim had died of an event unrelated to the stab wound when the operating surgeons, having repaired this wound also found and repaired a hernia. It was during this latter procedure that the victim either experienced a "broncho spasm” making ventilation impossible or that he was improperly ventilated by the anesthesiologist. In either event, the victim was deprived of oxygen for so long a period that massive brain damage and death resulted.
An interesting turn was added to this causation question in People v Cicchetti (44 NY2d 803 [1978]). There, in what the court described as a "brawl erupt[ing] into a bloodbath,” the
*736 victim was shot in the chest, allegedly by the defendant, thereafter stabbed six times including at least once in the chest and head apparently by others, and while prostrate but still alive on the floor was again allegedly shot in the head by defendant. Although mortal, medical testimony indicated that the stab wounds would not cause "immediate or rapid death.”
The Court of Appeals stated (supra, at 804): "The medical testimony was that the causes of death were the gunshot wound of the head and brain, stab wounds of the head and brain, gunshot wounds of the chest and lungs, and multiple stab wounds. Unlike People v Stewart (40 NY2d 692), there is no evidence of an intervening cause of death. To the contrary, the proof was that all of the wounds caused death, and defendant may not avoid responsibility by arguing that other causes contributed since his acts were also factors in the victim’s demise (see People v Kane, 213 NY 260, 273).”
Obviously this victim was mortally wounded by separate individuals at separate moments, each wound contributing to the victim’s demise. However, in finding no evidence of an intervening cause and thus holding the latter shooting defendant responsible, would the Court of Appeals also hold the former stabbing party criminally responsible of a homicide as the wounds he inflicted were, at the moment of the victim’s demise, also contributing thereto?
Further guidance and more to the case at hand was provided by the Court of Appeals in People v Eulo (63 NY2d 341 [1984]). In a ruling advancing the traditionally recognized legal and medical criteria of determining death, namely, the cessation of the cardiorespiratory functions, the court ruled (supra, at 357-358): "when a determination has been made according to accepted medical standards that a person has suffered an irreversible cessation of heartbeat and respiration, or, when these functions are maintained solely by extraordinary mechanical means, an irreversible cessation of all functions of the entire brain, including the brain stem, no life traditionally recognized by law is present in that body.”
This ruling was a direct consequence of the now common use of medical technology which allows for the artificial support of breathing, blood pressure and heartbeat through respirators and chemical regimen, but which "technical accomplishment has called into question the universal applicability of the traditional legal and medical criteria for determining when a person has died.” (People v Eulo, supra, at 350.)
*737 Thus the victims in Eulo (and People v Bonilla decided therewith) who had been shot in the head and who had been medically determined to be "brain dead” were in fact legally dead when surgeons removed vital organs for transplant and thereafter discontinued artificial life support.
Therefore, the Court of Appeals found that: "It was these medical pronouncements that caused the victims to be removed from the medical systems that maintained their breathing and heartbeat. If the victims were properly diagnosed as dead, of course, no subsequent medical procedure such as the organ removals would be deemed a cause of death.” (People v Eulo, supra, at 359.)
The court continued (supra, at 359): "If victims’ deaths were prematurely pronounced due to a doctor’s negligence, the subsequent procedures may have been a cause of death, but that negligence would not constitute a superseding cause of death relieving defendants of liability [citing People v Stewart, supra, and People v Kane, supra]. If, however, the pronouncements of death were premature due to the gross negligence or the intentional wrongdoing of doctors, as determined by a grave deviation from accepted medical practices or disregard for legally cognizable criteria for determining death, the intervening medical procedure would interrupt the chain of causation and become the legal cause of death (see People v Kane, supra, at pp 270-271; see, also, State v Scates, 50 NC 420). Thus, the propriety of the medical procedures is integral to the question of causation.”
Reflected in this dictum we believe is the legal recognition that in applying responsibility for criminal conduct, a defendant is held to the reasonably foreseeable consequences of his actions but is relieved of those consequences when an unforeseeable superseding act of another intervenes. Therefore, in the case at hand, once someone, through criminal conduct puts into motion the need for another to obtain medical assistance, in order to restore and preserve their well-being, it is reasonable for the wrongdoer to expect that, owing to the inexactness of medical science, accidents and malpractice may occur with grave consequences. It is not foreseeable, however, that malfeasance or gross negligence tantamount to intentional misconduct may occur, namely, a nurse allegedly removing life supports. But is this the sole consideration? What if it can be found that, at the moment of death, both causes are contributing thereto?
*738 In this regard, it should be noted that the example used in Kane (supra) dealt not with an instance of gross (intentional conduct) negligence but rather only suggested that, if the interns had "carelessly” administered a deadly poison from which the defendant died, rather than from a blood poisoning resulting, presumably, as a natural and foreseeable consequence of the miscarriage, which itself was a natural and foreseeable consequence of the shooting, then the defendant would be relieved of a homicide as the victim’s death would be "solely attributable to the secondary agency”. (People v Kane, supra, at 270; emphasis added.) Nor does Kane address the instance of a crime victim already suffering from blood poisoning attributable to the criminal assault when doctors, with gross negligence, administer a deadly poison, both ailments thus contributing to death.
It should also be noted, in passing, that State v Scates (50 NC 420 [1858], supra) cited as authority in Eulo (supra) involved an allegation of murder against a father for having mortally burned his two-year-old child. Medical testimony disclosed that the child had been seen some 20 hours after being burned and that a blow to the forehead was álso present. On cross-examination the attending physician explained "that he thought the burning was the primary cause of death, but that it was probably hastened by the wound on the head” (State v Scates, supra, at 421). The child died some 30 days after his injuries. At trial, testimony was also received from a witness "that the prisoner’s mother was greatly displeased at the marriage, and told the prisoner that, if he did not put the child out of the way, she would; that the prisoner was a weak-minded man, but considered as perfectly sane. This witness saw the child a few days after it was burnt, and there was no mark, then, on the forehead, but he saw such a mark some days before its death.” (State v Scates, supra, at 420-421.)
The impact of Scates, as cited in Eulo (supra), is found in the court’s pronouncement ordering a new trial: "If one man inflicts a mortal wound, of which the victim is languishing, and then a second kills the deceased by an independent act, we cannot imagine how the first can be said to have killed him, without involving the absurdity of saying that the deceased was killed twice. In such a case, the two persons could not be indicted as joint murderers, because there was no understanding, or connection between them. It is certain that the second person could be convicted of murder, if he killed *739 with malice aforethought, and to convict the first would be assuming that he had also killed the same person at another time. Such a proposition cannot be sustained.” (State v Scates, supra, at 423-424.)
From their very nature there is obviously a dearth of such cases dealing with a single individual being "killed twice.” Nevertheless, the issue was again reviewed in People v Lewis (124 Cal 551, 57 P 470 [1899]). There the defendant, a brother-in-law, shot the deceased in the abdomen inflicting a mortal wound. As he lay waiting to die, "the deceased procured a knife and cut his throat, inflicting a ghastly wound, from the effect of which, according to the medical evidence, he must necessarily have died in five minutes.” (People v Lewis, supra, 124 Cal, at 554, 57 P, at 471.)
Despite the intervention of the deceased’s extraordinary actions, the court in Lewis held the defendant criminally responsible for a homicide finding that "the causal relation between the unlawful acts of the defendant and the death has been made out” (supra, at 558, at 473). Additionally, the court stated: "If the throat cutting had been by a third person, unconnected with the defendant, he might be guilty; for, although a man cannot be killed twice, two persons, acting independently, may contribute to his death, and each be guilty of a homicide. A person dying is still in life, and may be killed, but, if he is dying from a wound given by another both may properly be said to have contributed to his death.” (Supra, 124 Cal, at 559, 57 P, at 473.)
Interestingly, Lewis distinguished its facts from those in Scates (supra) by noting that in Scates the victim was "languishing” from mortal burn injuries when, arguably, someone inflicted a mortal bludgeoning to the child’s skull. However, in Lewis the court noted (supra, at 559, at 473): "Here when the throat was cut, Farrell was not merely languishing from a mortal wound. He was actually dying — and after the throat was cut he continued to languish from both wounds. Drop by drop the life current went out from both wounds, and at the very instant of death the gunshot wound was contributing to the event.”
This then appears to be within the rationale of Cicchetti (supra) wherein the victim lay dying from mortal stab wounds to the head and chest, when the defendant inflicted the coup de grace — a bullet in the head. As in Lewis (supra), the victim’s life flowed from all his wounds, each individually and *740 collectively contributing to death. Certainly, the defendant therein was guilty of murder. Most probably it was medically impossible to favor one wound over another as the more likely cause of death. However, when it is medically possible to determine that a victim is mortally wounded, whereupon he suffers a second mortal wound or offense and that both thereafter contribute to death, are not both offenders criminally responsible for causing death? To repeat our earlier query: Would not the stabber in Cicchetti, were he known, also have been guilty of murder? Or would the Court of Appeals despite finding "no evidence of an intervening cause of death” but rather "that all of the wounds caused death” (People v Cicchetti, supra, at 804) continue to hold to the rationale of Scates (supra) that a person cannot be twice killed? And lastly, has not the court in Lewis, in factually distinguishing Scates, drawn a distinction without a meaningful difference?
In Eulo and Bonilla (supra) the Court of Appeals found that the trial juries therein were properly instructed to determine the "cause of death” even though the trial courts’ charges did not define death by either criteria but that: "By specifically charging the juries that they might consider the surgical procedures as superceding causes of death, the courts made clear by ready implication that death should be deemed to have occurred after all medical procedures had ended” (supra, at 358-359). The juries therein had, therefore, apparently found causation against the defendants under the rationale that relevant medical testimony had established that "brain death” had occurred before the medical intervention of removal of vital organs and life supports.
As noted above, the court in Eulo then added that causation for the victim’s death would continue to be criminally attributable to the defendants even if the pronouncements of death were premature due to a doctor’s negligence but that gross negligence or intentional wrongdoing of doctors "would interrupt the chain of causation and become the legal cause of death” (supra, at 359, citing People v Kane and State v Scates, supra).
If this court were constrained by the Court of Appeals dictum in Eulo (supra), we would be compelled to dismiss the manslaughter indictment herein. Without adequate instructions on causation and intervening event as set forth in Eulo, the Grand Jury could not have properly applied its factual findings regarding the credibility and impact of the nurses’ *741 and attending I.C.U. physician’s testimony on the actual cause of death.
However, we have provided some analysis herein as we believe further consideration is in order.
In Eulo the Court of Appeals was confronted with the recognition that when a person’s "respiratory and circulatory functions are maintained by mechanical means, their significance, as signs of life, is at best ambiguous” (supra, at 356).
Thus confronted, the Court of Appeals took up the issue of the propriety of removing such life supports in Matter of Westchester County Med. Center (O’Connor) (72 NY2d 517 [1988]). In acknowledging the common-law rule that "a person has the right to decline medical treatment, even life-saving treatment” (supra, at 528), the court renewed its specific subject-intent rule set forth in Matter of Storar and Matter of Eichner v Dillon (52 NY2d 363 [1981]) which required a medical facility to respect the wishes of an incompetent patient when there was a clear and convincing factual finding that the patient did not wish that certain medical procedures be employed in those instances specified by the patient while competent. Conversely, without such a clear and convincing showing no third party could decline medical treatment on behalf of a patient who was no longer competent to do so. (Matter of Westchester County Med. Center [O’Connor], supra, at 528, citing People v Eulo, supra, but footnoting Public Health Law art 29-B which "now authorized third parties to issue do not resuscitate orders for incompetent patients under certain circumstances.”)
The harshness of this rule’s application in certain extreme medical circumstances; as well as the practical difficulty in determining when evidence is so clear and convincing to enable a court to order a termination of life supports; as well as the dilemma of doing what might otherwise be in the patient’s better interest despite a clear and convincing pronouncement to the contrary by a then competent patient but who is now incompetent, was recognized by the New York State Legislature which enacted Public Health Law article 29-C. Competent adults may now appoint a health-care agent to make medical care decisions on their behalf in the event they lose decision-making capacity.
In the context of this case, it is legally clear that a competent crime victim, or an agent acting on behalf of an incompetent crime victim, cannot only decline extraordinary medical *742 measures but can also affirmatively request and obtain the removal of artificial life supports. Surely such action is not so dramatic as the throat cutting in Lewis (supra) but its mortal consequences are no less grave. If such action is, in fact, performed by an agent under the legal fiction that the agent is one with the victim, can we justify continuing this legal fiction to conclude that this action is a foreseeable link in the chain of events leading to the crime victim’s untimely demise? Or are we simply recognizing and legalizing the humane imperative; that it is time to remove artificial life supports? In any event and in either instance, the law does not conclude that the victim "caused” his own death so as to interrupt the chain of causation and thereby release the wrongdoer of a homicide. At worst we conclude that the victim’s actions only contributed to death.
Eulo reminds us that "the term 'death,’ although used in many statutes, has not been expressly defined by the Legislature” (supra, at 354); "that our Penal Law should be construed 'according to the fair import of [its] terms to promote justice and effect the objects of the law’ (Penal Law, § 5.00)”; and that "there is no theoretical or practical impediment to the People’s proceeding under a theory that the defendant 'cause[d] the death’ of a person, with death determined by either criteria” (i.e., cessation of cardiorespiratory functions or cessation of brain functions). (Supra, at 356-357, 359.)
Has not today’s medical innovations, whereby those legal indicias' of life, respiration and heartbeat, may now be mechanically induced, so blurred the distinctions between life and death or life only by virtue of artificial supports to compel us to redefine those criminal actions attributable to causing death and those which may justly be said to supercede the original criminal act and be the sole cause of death?
Has not the law now evolved to that point, where it ought to recognize the injustice to both the victim and to society that results if we continue to require of a jury a finding of superceding causation and to release the perpetrator from a homicide charge upon their finding that an unauthorized "angel of mercy” stepped forward and removed artificial life supports from a mortally wounded crime victim? This court believes it has. Whether that person should also be deemed to have committed murder (or better, to have committed some yet to be defined crime) should no longer provide escape to the initial perpetrator whose vicious act propelled the victim to certain and extended death and which act, at the time of the *743 victim’s release from artificial life supports, continued to be a substantial contribution to that death.
What is, therefore, both legally and logically compelling to this court is that the defendant Evelyn Vaughn’s alleged criminal conduct was the direct competent producing cause of Amelia Robinson’s ultimate fate — to lie mortally wounded, irretrievably dying, her moment of death being stayed only by artificial life supports. If this victim or her agent had been able to seek their removal and Amelia Robinson’s heart and lungs, unable to sustain life on their own, ceased to function, the defendant would not be relieved of responsibility for her alleged homicidal act. Similarly, this court finds no sustaining legal reason should remain which would serve to release this defendant if, under the circumstances alleged herein, the act of stopping life supports were carried out by an unauthorized, even malicious, third party.
The medical evidence before the Grand Jury was, in fact, that the victim was beyond medical help to retain life and that she would surely die within moments or days. Whether the cessation of the victim’s heartbeat was occasioned by intervention of medical personnel is unclear. Nevertheless, the clear medical evidence was that at the moment of death the initial stabbing continued to operate as a significant direct contribution thereto. The evidence and exhibits submitted and instructions given to the Grand Jury were, therefore, legally sufficient to establish the crimes charged (Penal Law §§ 125.20 [manslaughter in first degree], 120.10 [assault in first degree], 265.01 [criminal possession of weapon in fourth degree]) which, if unexplained or uncontroverted would warrant a conviction after trial. Defendant’s motion for dismissal of the indictment because of insufficiency in the Grand Jury presentation and/or for disclosure of the Grand Jury minutes, except as hereinafter noted, is denied.
BRADY MATERIAL
If the People have not already done so, they are directed to disclose as material within the purview of Brady v Maryland (373 US 83), all material and evidence submitted in its supplemental Grand Jury presentation, as well as the testimony of Leta Rochelle Ladd and Danita Jones given during the initial presentation.