OPINION OF THE COURT
Gerald Sheindlin, J.
The defendant was indicted for murder in the second degree (Penal Law § 125.25 [1]) and other related crimes. During this *39 nonjury trial, the issue of causation of death was presented to this court. The defense alleged that the victim had recovered from the gunshot wound he suffered and actually committed suicide by refusing nourishment and medical treatment. The People argued that the gunshot wound was a cause of death. This written decision supplements the oral decision rendered during the trial, wherein this court found that the gunshot wound was a sufficiently direct cause of the victim’s death to establish causation beyond a reasonable doubt.
FINDINGS OF FACT
On October 17, 1991, the victim, George Bittner, suffered a gunshot wound to his head while driving a cab in Bronx County. He was removed to Lincoln Hospital where he was diagnosed with a gunshot wound to the neck with transection of the right internal carotid artery and facial nerve paralysis. The victim contracted pneumonia which was treated and eventually cured. Since the victim continued to have difficulty speaking and swallowing a month after his admission, testing was performed but revealed no significant injury. The victim communicated by writing on a note pad and nodding in response to questions. He was interviewed in this manner by detectives concerning the incident. The victim commenced and participated in rehabilitation for speaking, swallowing and walking at Lincoln Hospital on November 13, 1991.
On December 4, 1991 the victim improved sufficiently to permit his transfer to Metropolitan Hospital for further rehabilitation. On admission he was found, among other diagnoses, to be unable to swallow and to require feeding by tube. The victim became depressed and distraught at his slow progress. On December 19, 1991, the victim pulled out his feeding tube and refused its reinsertion even after being advised of its vital necessity. Although the victim expressed a desire to return to regular food, he did not eat any when it was provided to him. He ingested only ice water and liquids. The victim also refused to participate in medical tests or procedures. He grew weaker and more emaciated until he suffered a cardiorespiratory arrest and died on December 24, 1991.
On December 27, 1991, an autopsy was performed by City Medical Examiner Edward Ginsberg. The external examination revealed a severely emaciated body with almost a completed absence of subcutaneous body fat and atrophy of the skeletal muscles. The Medical Examiner found that the victim *40 suffered a gunshot wound to the head and neck with a line of metallic fragments in the wound’s path between the right ear and left cheek. A large fragment of lead bullet was recovered from the deceased’s skull. Dr. Ginsberg found the cause of death to be a gunshot wound to the neck and head with healed wounds below the right earlobe and left cheek, fracture of the mandible,[1] complications of occlusion[2] of the right internal carotid artery, left hemiparesis[3] and inability to swallow, and refusal of feeding and medical treatment.
Dr. Jon Pearl of the Medical Examiner’s office testified at the trial to clarify and interpret the medical records and autopsy report.[4] He indicated that the scars were consistent with entry and exit wounds. Dr. Pearl found that the gunshot wound caused encephalomalacia of the brain — a degeneration of the brain that caused the clinical symptoms of weakness, difficulty swallowing and partial paralysis. Dr. Pearl explained that the resulting changes in the brain caused by the gunshot wound were the same as the results of a stroke. Dr. Pearl found that the gunshot wound contributed to the victim’s death. Dr. Pearl testified that the victim probably would have lived if he accepted food but would have suffered permanent disability. Although Dr. Pearl indicated the victim committed suicide by refusing food and medical treatment, he explained that if any action of a person contributes to a death, even if a minor contributing factor, death is classified as a homicide by the Medical Examiner’s office.
CONCLUSIONS OF LAW
To be found guilty of intentional murder, a defendant must intend to cause the death of another person and actually cause the death of that person. (Penal Law § 125.25 [1].) Proof of causation is mandatory for any homicide prosecution. (People v Brengard, 265 NY 100, 108 [1934].)
If a defendant’s actions are " 'a sufficiently direct cause’ ” of the death, criminal liability exists. (People v Kibbe, 35 NY2d 407, 413 [1974].) The question is whether the "ultimate *41 harm is something which should have been foreseen as being reasonably related to the acts of the accused.” (Supra, at 412.) If the defendant set in motion "the chain of events which ultimately resulted in the victim’s death”, homicide can be attributed to the defendant. (People v Bonilla, 95 AD2d 396, 409 [2d Dept 1983], affd 63 NY2d 341 [1984].) As long as the defendant’s actions are "at least a contribut[ory] cause” of death, homicide charges are appropriate. (Matter of Anthony M., 63 NY2d 270, 281 [1984].)
When death is attributed to more than one cause, the issue of causation becomes more complicated. If multiple injuries cause death together, each participant is criminally liable for the death if his actions were factors in the victim’s demise. (See, People v Cicchetti, 44 NY2d 803, 804-805 [1978] [defendant who shot victim after victim was stabbed was criminally liable where cause of death was both gunshot and stab wounds].) When a secondary and intervening event occurs between the initial injury and resulting death, the intervening event operates as a defense to criminal liability only "where the death is solely attributable to the secondary agency, and not at all induced by the primary one”. (People v Kane, 213 NY 260, 270 [1915] [secondary agency of improper medical treatment did not absolve the defendant of criminal liability].) A defendant does not escape criminal liability in this situation because "liability does not depend on death being the ‘immediate’ consequence of the injury”. (Supra, at 271.) As long as death is a consequence, causation is established. (See, e.g., People v Eulo, 63 NY2d 341, 359 [1984] [organ removal after shooting victim declared brain dead]; Matter of Anthony M., 63 NY2d 270, 280 [1984], supra [heart failure eight days after robbery]; People v Kibbe, 35 NY2d 407, 413 [1974], supra [robbery victim struck and killed by truck after being abandoned on road]; but see, People v Steward, 40 NY2d 692, 698-699 [1976] [causation not established where victim suffered cardiac arrest during treatment of incarcerated hernia and the necessity for treating the hernia during surgery for a knife wound was not proven].)
In the case at bar, the intervening event was the victim’s refusal of nourishment and medical treatment — in effect, his suicide. A review of the case law sheds little light on this situation. In an 1899 California case, criminal liability existed when a shooting victim slashed his own throat with a knife. (People v Lewis, 124 Cal 551, 57 P 470 [1899].) The court reasoned that the knife wound was caused by the gunshot *42 wound inflicted by the defendant and that the knife wound merely accelerated the victim’s death. (People v Lewis, 124 Cal, at 556, 57 P, at 472.) In an Indiana case decided in 1932, criminal liability was established when a rape and assault victim voluntarily poisoned herself while being held several days by her assailants. (Stephenson v State, 205 Ind 141, 179 NE 633 [1932].) Upholding a murder conviction, the court found that the defendant "by his acts and conduct rendered the deceased distracted and mentally irresponsible, and that [suicide] was the natural and probable consequence of such unlawful and criminal treatment”. (Supra, at 190-191, at 649.) In United States v Hamilton (182 F Supp 548 [D DC 1960]) criminal liability was established when the victim of a vicious assault pulled out his breathing tubes and subsequently died. Criminal liability existed even if the defendant’s actions might not have been fatal and the victim’s actions contributed to his own death because the defendant’s actions commenced a chain of causation leading to death. (Supra, at 550.) As in Lewis (supra), the court in Hamilton deemed the victim’s motivation irrelevant.
Apparently no New York courts have dealt directly with the issue of suicide as an intervening event and whether it breaks the chain of causation. However, treatment of the issue of removal of life support systems does aid the analysis. A court of concurrent jurisdiction found a defendant properly charged with manslaughter in the first degree for the death of a victim she mortally wounded after a nurse turned off the victim’s life support system. (People v Vaughn, 152 Misc 2d 731 [Sup Ct, Erie County 1991, Kubiniec, J.].) Although it was unclear whether the victim’s cardiac arrest was caused by the removal of the life support system, the court found that the defendant who stabbed the victim was criminally liable because "the clear medical evidence was that at the moment of death the initial stabbing continued to operate as a significant direct contribution thereto.” (People v Vaughn, 152 Misc 2d, at 743.) Adopting the legal fiction that an agent who terminates the life support system is one with the victim, the court questioned whether it can "justify continuing this legal fiction to conclude that this action is a foreseeable link in the chain of events leading to the crime victim’s untimely demise? Or are we simply recognizing and legalizing the humane imperative; that it is time to remove artificial life supports? In any event and in either instance, the law does not conclude that the victim 'caused’ his own death so as to interrupt the chain of causation and thereby release the wrongdoer of a homicide. At *43 worst we conclude that the victim’s actions only contributed to death.” (Supra, at 742.) The court believed that the law has evolved to the point "where it ought to recognize the injustice to both the victim and to society that results if we continue to require of a jury a finding of superceding causation and to release the perpetrator from a homicide charge upon their finding that an unauthorized 'angel of mercy’ stepped forward and removed artificial life supports from a mortally wounded crime victim? This court believes it has.” (Supra, at 742.) Whether the second actor committed a crime "should no longer provide escape to the initial perpetrator whose vicious act propelled the victim to certain and extended death and which act, at the time of the victim’s release from artificial life supports, continued to be a substantial contribution to that death.” (Supra, at 743.) The court found no difference if the removal of the life support system had been accomplished by the victim herself. In Vaughn, the victim was not recuperating and was being supported by artificial life supports. In the instant case, however, the victim was recuperating and was not in extremis.
Applying the rationale of the above-cited cases to the facts herein, this court concludes that the People have met their burden of proving causation. The victim acted voluntarily in refusing nourishment and medical treatment. However, his inability to ingest food orally was directly caused by the gunshot wound he suffered. The gunshot wound created the difficulty swallowing and the difficulty swallowing prevented him from ingesting food orally. The gunshot wound set in motion a chain of events resulting in hospitalization, difficult swallowing, and forced feeding, the cessation of which resulted in death. The gunshot wound forged a causative link between the initial injury and death and was a sufficiently direct and contributing event which eventually resulted in death. The suicide does not operate as an intervening act that excuses criminal liability because death was not solely attributable to this secondary agency. Death was caused by both the gunshot wound and the malnutrition. Perhaps criminal liability would be excused if the victim had recovered sufficiently to be discharged from the hospital and committed suicide at a more remote time to the initial injury. However, that is not the situation here and this court is not called upon to answer that question. Here, the People established causation beyond a reasonable doubt.

. The mandible is the inferior jaw bone. (Stedman’s Medical Dictionary 741 [1972].)

. Occlusion is "the act of closing or the state of being closed.” (Stedman’s, op. cit, n 1, at 868.)

. Hemiparesis is "slight paralysis affecting one side only.” (Stedman’s, op. cit, n 1, at 562.)

. Dr. Ginsberg was no longer employed by the Medical Examiner’s office.